UNITED STATES of America

v.

**Dale R. GURGIOLO, Appellant.**

**Nos. 89–3519, 89–3549.**

United States Court of Appeals,
Third Circuit.

Argued Jan. 9, 1990.

Decided Jan. 12, 1990.

Rehearing and Rehearing In Banc
Denied Feb. 13, 1990.

Robert L. Potter (argued), Frank Arcuri, Strassburger, McKenna, Gutnick & Potter, Pittsburgh, Pa., for appellant.

Charles D. Sheehy, Acting U.S. Atty., Bonnie R. Schlueter (argued), Asst. U.S. Atty., Pittsburgh, Pa., for appellee.

Before GIBBONS, Chief Judge, SCIRICA, Circuit Judge, and WALDMAN,* District Judge.

## OPINION OF THE COURT

GIBBONS, Chief Judge:

Dale R. Gurgiolo appeals from a judgment of sentence entered by the District Court of the Western District of Pennsylvania on July 11, 1989. The district court sentenced Gurgiolo to seven and a half years imprisonment on four counts of federal drugs violations, to which he had pleaded guilty. Gurgiolo now challenges this sentence on the grounds the district court misconstrued the Federal Sentencing Guidelines when it calculated the base offense level attributable to Schedule III substances. The government cross-appeals, arguing that the court miscalculated the weight of the Schedule II substances involved in Gurgiolo's offenses. We will reverse the district court's judgment of sentence on both grounds.[1]

## I.

According to the scheme established by the Federal Sentencing Guidelines, a criminal defendant's sentence depends on two factors. The first factor is the "offense level," a numerical value ranging from 1 to 43 that corresponds to the severity of the crime. *See* United States Sentencing Comm'n, Federal Sentencing Guidelines Manual §§ 1B1.1, 2A1.1–2X5.1. To calculate this offense level, one starts by looking to the Guidelines, which assign a "base offense level" to all federal crimes. For example, the Guidelines assign a base offense level of 43 to first degree murder, whereas the base offense level for trespass is 4. *See id.* This value may then be adjusted upwards or downwards in light of certain mitigating or aggravating factors, such as the extent to which the defendant accepts responsibility (a mitigating factor), or whether the defendant obstructed justice in the course of the proceedings against him (an aggravating factor). *See id.* at §§ 3A1.1–3E1.1. The second major factor upon which a defendant's sentence depends is his "criminal history category." *See id.* at §§ 4A1.1–4B1.3. There are six such categories. The lengthier the criminal history, the higher the category into which the defendant is placed.

Once these two factors are calculated, the defendant's sentence may then be determined by referring to a chart in the

---

* Hon. Jay C. Waldman, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

1. Gurgiolo also moves to dismiss the government's appeal on the grounds that it has failed to comply with 18 U.S.C. § 3742(b), which requires the "personal approval of the Attorney General or the Solicitor General" before a notice of appeal may be filed by the government in a case challenging a sentencing decision. We disagree. When the Solicitor General is unavailable, it is sufficient for section 3742(b) purposes for the government, as here, to secure the approval of the Deputy Solicitor General acting in the Solicitor General's place. Second, the fact that the government's notice of appeal failed to indicate this approval in its text does not dictate dismissal. *See* Fed.R.App.P. 3(c) ("[a]n appeal shall not be dismissed for informality of form or title of the notice of appeal.").

Guidelines entitled the "Sentencing Table." This chart cross-tabulates the defendant's offense level against his criminal history category, and yields a range of months for which the defendant may be imprisoned. *See Id.* at § 5.2. For example, if a defendant's offense level is 17 and his criminal history category is III, the Sentencing Table dictates a prison sentence of 30 to 37 months. *Id.*

This methodology becomes more complicated when the offense involves illegal drugs. This wrinkle arises because the severity of a particular drug-related crime, and hence its appropriate numerical offense level, depends not just on the general nature of the crime, but on the quantity and type of drug involved in the particular offense. To solve this problem, the Guidelines provide "Drug Quantity Tables" that set forth base offense levels for drug violations according to the type and weight of certain drugs. *See id.* at § 2D1.1. Under these tables, the base offense level rises in direct relation to the weight and seriousness of the drug. For example, a crime involving between 40 and 60 grams of heroin is given a base level of 20, whereas a crime involving from 60 to 80 grams of heroin is given a base level of 22, and so on.

Yet another complication arises, however, when a crime involves a variety of different drugs. In such circumstances, it is necessary to convert the weights of the different drugs involved in the crime to a single, uniform value for purposes of determining the base offense level. The Guidelines achieve this result by setting forth in "Drug Equivalency Tables" certain conversion factors by which the weights of different drugs can be translated into an "equivalent" weight in heroin. *See id.* According to this table, for example, 1 gram of codeine is equivalent to .08 grams of heroin. An individual charged with trafficking 100 grams of codeine thus should receive the base offense level that applies to a crime involving 8 grams of heroin (100 $\times$ .08 = 8).

## II.

During the period when Dale Gurgiolo committed his offenses, he was a licensed pharmacist who practiced in Pittsburgh, Pennsylvania. In July of 1987, Federal Drug Enforcement agents began to suspect that Gurgiolo was involved in illegally selling various pharmaceutical drugs to distributors. After a lengthy investigation, these agents obtained a warrant to search Gurgiolo's pharmacy, which they executed in November of 1988. Upon conducting this search, the agents found that Gurgiolo's records reflected considerable shortages in oxycodone, hydrocodone, codeine, glutethimide, and diazepam. Gurgiolo eventually confessed to selling these drugs unlawfully to individuals without valid prescriptions.

On March 22, 1989, a grand jury indicted Gurgiolo on four counts of federal drugs violations: (1) conspiracy to distribute and possession with intent to distribute oxycodone, hydrocodone, codeine, glutethimide, and diazepam (listed as Schedule II, III, and IV controlled substances) under 21 U.S.C. § 846; (2) possession with intent to distribute codeine (listed as a Schedule III controlled substance) under 21 U.S.C. § 841(a)(1); (3) possession with intent to distribute glutethimide (listed as a Schedule III substance) under 21 U.S.C. § 841(a)(1); and (4) possession with intent to distribute diazepam (listed as a Schedule IV substance) under 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(D). Gurgiolo pleaded guilty to all four counts on April 28, and the district court ordered a presentence report.

The district court followed the steps dictated by the Guidelines in calculating Gurgiolo's sentence. Having a clean criminal record, Gurgiolo was placed in the lowest criminal history category of I. Determining his base offense level was more difficult, however, given the combination of unconventional drugs involved in his crimes. The presentence report filed by the Probation Office concluded that the appropriate offense level in Gurgiolo's case was 26: referring to the Drug Equivalency Tables, the report converted each of the drugs involved in Gurgiolo's offenses into

heroin equivalencies. According to the report, the total heroin equivalency was 307.-7891 grams, to which the Guidelines assign a base offense level of 26. The report adjusted this figure upward by two points in light of Gurgiolo's abuse of his position as a pharmacist, but readjusted it downward by the same value in light of his acceptance of responsibility. With a net offense level of 26, and a criminal history category of I, the presentence report referred to the Sentencing Table, which yielded a recommended sentence of 63 to 78 months.

Following the issuance of the presentence report, a dispute arose as to the method by which hybrid drugs, such as Tylenol mixed with codeine, ought to be weighed. Gurgiolo argued that only the pure weight of the drug—in this case the codeine and not the Tylenol—should be weighed for purposes of conversion into heroin equivalency. The government disagreed, arguing that the total weight of the drug should be used in the calculation. On July 11, 1989, the district court rendered a split decision. As to Schedule III and IV substances, the court held, the sentence should be based on total weight, whereas for Schedule II substances, the calculation must be based on "pure" weight. According to the court's ensuing recalculation, the total weight of heroin equivalency for which Gurgiolo was responsible was 796.-2477 grams, which resulted in a base offense level of 30. Under this new result, the Guidelines suggested a sentence of 97 to 121 months. The district court, however, held that a downward departure was appropriate, and reduced the range to 87 to 93 months. On July 11, 1989, the court sentenced Gurgiolo to seven and a half years imprisonment on the four counts to which he had plead guilty.

### III.

■ Of the approximately 386 kilograms of drugs for which Gurgiolo was found guilty, 379 kilograms were so-called Schedule III substances. The remainder was comprised of about 5 kilograms of Schedule IV substances, and 71 grams of Schedule II substances. The district court calculated Gurgiolo's offense level merely by converting the gross weight of all of these substances into a heroin equivalency of 760 grams, and applying the base offense level that is assigned to crimes involving that amount of heroin. It is this part of the district court's calculation that Gurgiolo challenges.

As Gurgiolo points out, the district court's conversion method clearly conflicts with the plain language of the Guidelines. The Drug Quantity Tables set forth a graduated progression of base offense levels for crimes involving Schedule III drugs:

| Amt. of Sch. III Drug | Base Offense Level |
| --- | --- |
| 125 grams or less | Level 6 |
| 125–500 G | Level 8 |
| 500 G–1.25 KG | Level 10 |
| 1.25–2.5 KG | Level 12 |
| 2.5–5 KG | Level 14 |
| 5–10 KG | Level 16 |
| 10–20 KG | Level 18 |
| "20 KG or more" | Level 20 |

See Drug Quantity Tables, Federal Sentencing Guidelines at § 2D1.1. The Drug Quantity Tables thus make clear that a base offense level of 20, and no higher, applies to crimes involving "20 KG *or more* of Schedule I or II Depressants or Schedule III substances." *Id.*

In addition to this plain language, the maximum penalty for drug violations involving Schedule III substances also suggests that the district court overshot the offense level for Gurgiolo. According to section 841(b)(1)(D) of the Criminal Code, "in the case of any controlled substance in schedule III, such person shall ... be sentenced to a term of imprisonment of not more than 5 years." 21 U.S.C. § 841(b)(1)(D) (1989). It makes no sense, given this statutory maximum, to arrive at an offense level merely by converting the gross weight of a Schedule III substance into a heroin equivalency and then looking to the penalty applicable to that weight in heroin. Such a method would not only render superfluous the language in the Drug Quantity Tables referring to Schedule III substances, but would yield recommended sentences that far exceeded the statutory maximum.

There is no self-evident reason to depart from the plain language of the Guidelines. In cases involving the distribution of more than 20 kilograms of Schedule III substances, the maximum base offense level is 20. It is true that the Guidelines provide for conversion of substances into an equivalent weight in grams of heroin when different substances are involved in a single criminal act. However, nothing in the Guidelines suggest that this mechanism exists to bypass the careful categorization of base offense levels assigned to crimes involving different amounts of Schedule III substances. Rather, this conversion mechanism exists as a supplement to the Drug Equivalency Tables, to be used when that categorization is inappropriate. When, for example, a sentence is to be based on a variety of different drugs, the conversion mechanism allows the court to convert the weight of all of the drugs into a single weight value. This does not mean, however, that the court may disregard the maximum offense level that may be attributed to a particular drug.

In this case, then, the court erred when it converted all of the Schedule III substances involved into an equivalent weight in heroin of 379 grams, and then proceeded to assign a base offense level based on this gross converted weight. Because the Guidelines establish a cap of 20 on the offense level attributable to crimes involving Schedule III substances, the district court ought to have held that the maximum heroin equivalent for those substances was 59 grams. This is so because the Guidelines provide for a base offense level of 20 for crimes involving 20 kilograms or more of Schedule III substances, and since that base offense level also applies to offenses involving at most 59 grams of heroin. In reaching the total heroin equivalent, therefore, the court should have limited the contribution of Schedule III substances to a heroin equivalency of 59 grams.

## IV.

■ In calculating the heroin equivalency of the Schedule II, III, and IV substances upon which Gurgiolo's sentence was to be based, the district court faced a dispute over whether the Guidelines require the whole weight of the drugs to be converted to a heroin equivalency, or whether the court should count merely the "pure" weight of the illegal substances. Prior to sentencing, Gurgiolo argued that only the "pure" weight of the drugs should be counted against him. The government disagreed, arguing that the whole drug should be weighed in arriving at a base offense level.

In a split decision issued on July 11, the district court held that, insofar as Schedule III and IV drugs are concerned, the whole weight of the drug is to be converted to heroin equivalency. When, however, Schedule II drugs are involved, only the "pure" weight should be converted. *See* App. at 223. In Gurgiolo's case, the court thus reduced the 4.929 kilograms of drugs containing Schedule II substances to 71.265 grams of pure drugs. In its cross-appeal, the government challenges this result, and seeks a recalculation of the Schedule II drugs involved in Gurgiolo's crimes.

Insofar as the district court weighed the Schedule III and IV drugs in their entirety, the court acted correctly. Several authorities support this position. First, the Guidelines erect a presumption in favor of weighing the entire substance when calculating heroin equivalencies. A footnote to the Drug Quantity Tables provides:

> Unless otherwise specified, the weight of a controlled substance set forth in the table refers to the entire weight of any mixture or substance containing a detectable amount of the controlled substance.

Federal Sentencing Guidelines at § 2D1.1 (footnote to Drug Quantity Tables). This comment is backed up by the underlying federal statute defining drug-related crimes, 21 U.S.C. § 841. In setting forth a schedule of sentences for various drug-related crimes, section 841 consistently bases particular sentences on the gross weight of any "mixture or substances containing a detectable amount" of the illegal narcotic, such as heroin, cocaine, LSD, and the like. *See* 21 U.S.C. § 841(b)(1)(A)(i)–(viii). Drugs containing detectable amounts of these

substances thus should be weighed as a whole, irrespective of purity.

The district court concluded, however, that an exception was warranted for Schedule II substances. The court based this conclusion on the following reasoning: In defining the penalties applicable to crimes involving Schedule II substances, section 841(b)(1)(C) merely states that "[i]n the case of a controlled substance in schedule I or II as provided in subparagraphs (A), (B), and (D), such person shall be sentenced [as specified]." 21 U.S.C. § 841(b)(1)(C). The fact that section 841 does not employ the same language—namely, any "mixture or substances containing a detectable amount"—for Schedule II substances, according to the court, means that Congress did not intend the whole drug to be weighed.

This reasoning is unpersuasive. First, section 841 explicitly provides for weighing the whole drug in cases involving cocaine, which is a Schedule II substance. *See* 21 U.S.C. § 812; 21 U.S.C. § 841(b)(1)(A)(ii)(II). Hence, section 841 does not create a clear distinction between the method of weighing Schedule II substances and the method of weighing Schedule III and IV substances. Moreover, it is counter-intuitive to think that, absent explicit direction, Congress would be more lenient with the weighing of Schedule II substances, which are considered to be more dangerous than Schedule III and IV substances. Indeed, Congress requires the whole drug to be weighed when the drug consists at least in part of a detectable amount of Schedule I substances, such as LSD and heroin, which are the most dangerous substances available. *See* 21 U.S.C. § 841(b)(1)(A). In short, where Congress provides for full-weight conversion of Schedule I, III, and IV substances, there is no self-evident reason to conclude that it meant to treat Schedule II drugs differently. The district court's holding should therefore be reversed.

## V.

For the foregoing reasons, the district court erred in calculating Gurgiolo's sen-

tence. We accordingly reverse the district court's judgment of sentence, and remand with instructions to recalculate Gurgiolo's punishment under the Federal Sentencing Guidelines consistent with our conclusions in this opinion. We also deny Gurgiolo's motion to dismiss the government's appeal.