

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-29-2001

# United States v. Butch

Precedential or Non-Precedential:

Docket 99-5738

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"United States v. Butch" (2001). *2001 Decisions.* Paper 143.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/143

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed June 29, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 99-5738

UNITED STATES OF AMERICA,

v.

JOSEPH BUTCH
        Appellant

On Appeal From the United States District Court
For the District of New Jersey
(D.C. Criminal No. 98-00390)
District Judge: Honorable Stephen M. Orlofsky

Submitted Under Third Circuit LAR 34.1(a)
April 24, 2001

Before: BARRY, AMBRO and ALDISER T, Circuit Judges

(Filed: June 29, 2001)

        Mark W. Catanzaro
        Suite 208
        513 South Lenola Road
        Blason IV
        Moorestown, NJ 08057

        Attorney for Appellant, Joseph Butch

Robert J. Cleary
United States Attorney

George S. Leone
Chief, Appeals Division
970 Broad Street
Newark, NJ 07102-2535

Norman J. Gross,
Assistant United States Attorney
Camden Federal Building and
 United States Courthouse
401 Market Street, Fourth Floor
Camden, NJ 08101-2098

Attorneys for Appellee, United States
of America

OPINION OF THE COURT

AMBRO, Circuit Judge:

Joseph Butch challenges his conviction following a jury trial in the United States District Court for the District of New Jersey (the "District Court") on one count of violating 21 U.S.C. S 846 by conspiring to distribute and to possess with intent to distribute oxycodone, a Schedule II narcotic controlled substance, contrary to 21 U.S.C.S 841(a)(1). He also challenges the sentence imposed by the District Court. Butch alleges that the District Court (1) impr operly admitted evidence of prior thefts of oxycodone at trial, (2) erred in determining the applicable sentencing range under the United States Sentencing Guidelines by attributing to him the entire weight of each pill rather than calculating the amount of the controlled substance per pill, and (3) erred by failing to submit the weight of the controlled substance to the jury for a factual determination beyond a reasonable doubt in light of Apprendi v. New Jersey, 530 U.S. 466 (2000). We have jurisdiction over this appeal pursuant to 28 U.S.C. S 1291. For the r easons that follow, we will affirm the conviction and sentence.

2

I.

At the time of this alleged criminal activity, Butch was
employed as a scheduler and dispatcher for two r elated,
Philadelphia-based commercial truck and driver leasing
companies, Marano Truck Lease ("Marano") and American
Helper ("AH"). Marano and AH leased trucks and drivers to
the courier service Rapid Delivery Services ("RDS"). RDS in
turn was employed by Amerisource, a wholesale distributor
of pharmaceutical drugs and other medical pr oducts, to
deliver those products from its war ehouse in Thorofare,
New Jersey, to hospitals and pharmacies.

From September, 1997 through January, 1998, Butch
scheduled Robert Manning ("Manning"), a temporary driver
for AH, to a delivery route for Amerisour ce. According to
Manning's testimony, on January 7, 1998 Butch of fered
Manning $5000 to help him steal a tote of Amerisour ce's
pharmaceutical drugs from the back of the delivery truck
that Manning would be driving the next day. Manning
agreed. On January 8, 1998, Manning met Butch and
another man at a Burger King restaurant on Front Street in
Philadelphia. Butch retrieved a plastic tote containing the
drugs from the back of the truck. After Manning had
resumed his route, Butch discovered that he had stolen the
wrong tote. Butch called Manning and arranged to have the
third man meet Manning at a Dunkin' Donuts shop to pick
up the correct tote, which he did. When Manning arrived
later at the Veteran's Administration hospital in
Philadelphia, he called the police and reported the theft as
planned. Several days later, Butch gave Manning the
agreed-upon $5000.

In April and May of 1998, Butch twice solicited Manning
to steal pharmaceutical drugs from Amerisource trucks
that others were driving. Butch identified the trucks, the
delivery routes and the drug totes, and gave Manning the
key. Manning was to follow the trucks and steal the drugs
when the drivers left the trucks unattended. Manning took
the keys, but did not follow through with the theft of any
drugs.

On May 19, 1998, Butch offered $5000 to George Fronick
("Fronick"), another AH driver who made deliveries for

3

Amerisource, to help him steal pharmaceutical drugs from the truck Fronick was driving. Fronick r eported the plan to his supervisor at RDS, and the FBI and DEA wer e notified. Investigators for the two agencies arranged for Fr onick to cooperate in apprehending Butch.

After a failed attempt on May 20, 1998, Butch again solicited Fronick to assist him in his theft plans. Fronick reported the solicitation to his supervisor , and the investigators supplied Fronick with a concealed micro-cassette recorder and a video camera to place in the back of his truck. On June 4, 1998, Butch detailed the plan to have Fronick arrive at Mercy Hospital at 6:30 a.m., drive the front of the truck up to the loading dock, and unlock the back of the truck. A third man would unload the totes from the back of the truck. Fronick was then to get rid of the padlock, and report the theft to the police. This conversation was recorded on the micr o-cassette carried by Fronick. The third man was Manning, who testified that Butch instructed him to take the drugs from the back of the truck, deliver them to Butch at a Dunkin' Donuts shop near the Marano facility, and report to a job Butch had scheduled for him.

Early the next morning, Fronick met Butch at a gas station and went over the plan. Butch gave Fr onick two plastic trash bags, told him to put the boxes of drugs into the bags, and to leave them at the back of the truck. Fronick picked up the delivery and drove his truck to Mercy Hospital according to Butch's instructions. When he reached the hospital parking lot, Fronick activated the hidden camera in the truck and proceeded with the plan. In addition to the hidden camera and the hospital's own surveillance camera, the investigators had the entir e scene under surveillance. They observed Butch and another man, Fred Moll ("Moll"), sitting inside Moll's car. They also observed Manning approach the truck, remove two plastic bags containing the boxes of pharmaceutical drugs, and place them into the trunk of his car. As Manning attempted to drive out of the hospital parking lot, the investigators stopped and arrested him, seizing the bags fr om the trunk. Other agents blocked Moll's car and arrested Moll and Butch. The bags contained 26,400 Endocet tablets, a

4

generic form of Percocet, each tablet containing approximately 4.4 milligrams of oxycodone and 325 milligrams of acetaminophen. See Physicians' Desk Reference 1211 (55th ed. 2001).

On June 18, 1998 a federal grand jury sitting in Newark, New Jersey returned a one count indictment, charging "[f]rom on or about May 19, 1998 to on or about June 5, 1998, . . . Joseph Butch did knowingly and intentionally conspire and agree with others to distribute and to possess with intent to distribute oxycodone, a Schedule II narcotic drug controlled substance, contrary to Title 21, United States Code, Section 841(a)(1), [i]n violation of Title 21 United States Code, Section 846." The indictment did not specify the quantity of oxycodone attributable to Butch.

On April 26, 1999, the Government filed a motion in limine seeking the admission of evidence of Butch's January and May, 1998 dealings with Manning as intrinsic to the conspiracy charged or, alternatively, as admissible under Federal Rule of Evidence 404(b). On May 3, 1999, the day that the jury trial began, the District Court issued a published opinion[1] denying the Government's motion to admit the evidence as intrinsic to the conspiracy and as evidence of a common scheme and plan.[2] However, the District Court admitted under Rule 404(b) the testimony of Manning for the limited purpose of establishing the background of the conspiracy as charged in the indictment. The District Court also recited the limiting instruction it intended to accompany the evidence.

The Government introduced evidence of the January and May, 1998 events at trial. The limiting instruction was given. Butch testified in his own defense, denying any criminal intent and claiming that it was Manning who had solicited him to steal the drugs. Butch also testified that he pretended to participate in the scheme in order to catch Manning in the act. The jury rejected Butch's defense and

_____

1. See United States v. Butch, 48 F. Supp. 2d 453 (D.N.J. 1999).

2. The indictment alleged a conspiracy from May 19 to June 5, 1998, which in the District Court's opinion rendered the events in January and early May, 1998 too remote to be inextricably intertwined with the conspiracy as charged, and not part of a single criminal episode.

on May 11, 1999, convicted him of the charge. The District Court sentenced Butch to 240 months (20 years) imprisonment, the statutory maximum for the crime of which he was convicted.

II.

Butch's initial challenge on appeal is that the District Court improperly permitted the Gover nment to introduce evidence of his January and May, 1998 dealings with Manning under Federal Rule of Evidence 404(b).3 The nature of his objection is twofold. First, Butch argues that the testimony of specific events admitted to establish the background of a conspiratorial relationship goes well beyond the limited, general questioning that this Court permits. See United States v. O'Leary, 739 F.2d 135 (3d Cir. 1984). Second, he argues that the probative value of the evidence is substantially outweighed by its pr ejudicial effect. We review the District Court's decision to admit evidence under Rule 404(b) for an abuse of discr etion, which "may be reversed only when `clearly contrary to reason and not justified by the evidence'." United States v. Balter, 91 F.3d 427, 436 (3d Cir. 1996) (citing United States v. Bethancourt, 65 F.3d 1074, 1079 (3d Cir. 1995)). We conclude that the District Court did not abuse its discretion in admitting Manning's testimony as background evidence of a conspiratorial relationship pursuant to Rule 404(b).

The "threshold inquiry a court must make before admitting similar acts evidence under Rule 404(b) is whether that evidence is probative of a material issue other

_____

3. Federal Rule of Evidence 404(b) provides:

        (b) Other crimes, wrongs, or acts. Evidence of other crimes, wrongs,
        or acts is not admissible to prove the character of a person in order
        to show action in conformity therewith. It may, however, be
        admissible for other purposes, such as proof of motive, opportunity,
        intent, preparation, plan, knowledge, identity, or absence of mistake
        or accident, provided that upon request by the accused, the
        prosecution in a criminal case shall pr ovide reasonable notice in
        advance of trial, or during trial if the court excuses pretrial notice
        on good cause shown, of the general nature of any such evidence it
        intends to introduce at trial.

than character." Huddleston v. United States, 485 U.S. 681, 686 (1988). This Court recently set out a four -factor standard governing the admissibility of evidence pursuant to Rule 404(b), which requires: (1) a pr oper evidentiary purpose; (2) relevance under Rule 402; (3) a weighing of the probative value of the evidence against its pr ejudicial effect under Rule 403; and (4) a limiting instruction concerning the purpose for which the evidence may be used. United States v. Mastrangelo, 172 F.3d 288, 294 (3d Cir. 1999).

The District Court found that the Government met its burden of articulating the requisite "chain of logical inferences" in support of a proper evidentiary purpose, satisfying the first prong. Butch, 48 F. Supp. 2d at 459 (citing Mastrangelo, 172 F.3d at 294). Because Manning's testimony was "logically relevant to explain his role in the criminal enterprise" and because it "would give the jury a complete story of the crime by explaining the cir cumstances of the alleged relationship between the alleged conspirators," the District Court found the testimony relevant under the second prong. Id. at 460. Under the Rule 403 balancing test, the District Court concluded that the probative value of Manning's testimony outweighed any prejudicial effect. "As an alleged participant in the charged conspiracy, Manning's testimony is significantly probative of the formation of his criminal relationship with Butch in January, 1998, as well as[ ] the further development of that relationship during the events of early May, 1998." Id. Moreover, the evidence of the prior criminal activity detailed a similar crime against the same victim, without the use of violence or threats, and thus the testimony to this effect was not overly prejudicial. Thus, the District Court concluded that the evidence "does not rise to the level of the distracting, confusing, or emotionally char ged evidence from which Rule 403 protects a criminal defendant." Id. at 461. Finally, the District Court gave the requisite limiting instruction to satisfy the fourth prong and eliminate an "undue tendency . . . suggest[ing] a decision on an improper basis . . . ." See Fed. R. Evid. 403, Advisory Committee's Note.4

_____

4. Deciding on the Government's motion in limine, the District Court stated:

7

In light of the District Court's thorough analysis in its published opinion of Manning's testimony under the Mastrangelo factors, Butch cannot demonstrate an abuse of discretion. This Court has held that "testimony of . . . a co-conspirator . . . could be considered r elevant to provide necessary background information, to show an ongoing relationship between [the defendant and a co-conspirator], and to help the jury understand the co-conspirator's role in the scheme." United States v. Simmons, 679 F.2d 1042, 1050 (3d Cir. 1982). This was precisely the purpose for which the Government sought to introduce Manning's testimony. Moreover, in its discussion of O'Leary, the District Court noted:

> The Government's evidentiary purposes in O'Leary and the Government's evidentiary purposes in this case are identical, namely, to show background of the charges, the witness' and the defendant's relationship, and their concerted action. In light of Simmons, Harris, Moore, and Pipola, Butch's attempt to limit O'Leary to its specific facts, though spirited, is without merit.

---

> Prior to the Government's inquiry into the events of January and early May, 1998, at the conclusion of Manning's testimony, and again when I charge the jury, I will instruct the jury as follows:
>
> Evidence that Mr. Butch was involved in a criminal enterprise with Mr. Manning in January, 1998, and with Mr. Manning and Mr. Frederick Moll in early May, 1998, has been admitted into evidence, but you may consider that evidence only as background to the offense charged in the Indictment, as evidence of Mr. Manning's and Mr. Butch's relationship prior to May 19, 1998, and as evidence of their concerted efforts prior to May 19, 1998. You may not, however, consider this evidence of Mr. Butch's prior involvement in a criminal enterprise in deciding whether or not the Government has proven Mr. Butch's guilt beyond a reasonable doubt for the offense charged in the Indictment. For the limited purpose for which this evidence has been received, you may give it such weight as you feel it deserves. You may not, however, consider this evidence for any other purpose. See 1 Devitt, et al., Federal Jury Practice and Instructions S 11.09 (4th ed).

Butch, 48 F. Supp.2d at 461. The limiting instruction actually given by the District Court mirrors this instruction.

8

> Accordingly, I find that the Government has sufficiently proffered a proper evidentiary purpose for introducing into evidence the January and early May, 1998, events.

Butch, 48 F. Supp. 2d at 460 (citations omitted). We agree with the District Court's reading of O'Leary, and can find no abuse of the Court's discretion.[5]  As a result, we will affirm Butch's conviction.

III.

Butch also challenges his sentence on the gr ound that the District Court erred when it attributed to him the gross weight of the Endocet pills rather than the net weight of the controlled substance oxycodone in the pills. This error, he contends, resulted in an incorrect range under the Sentencing Guidelines. Our review of the District Court's interpretation and application of the Sentencing Guidelines is plenary, whereas we review its findings of fact for clear error. United States v. Yeaman, 194 F.3d 442, 456 (3d Cir. 1999).

The District Court sentenced Butch to 240 months imprisonment, determined as follows. Accor ding to the DEA's laboratory report, the accuracy of which Butch did not contest, the 26,400 Endocet pills had a combined weight of 14.49 kilograms. See Presentence Report ("PSR")

_____

5. We also agree with the Gover nment's contention that it also could have introduced the evidence under Rule 404(b) to rebut Butch's testimony that he acted without criminal intent. Such evidence is permissible to show criminal intent and the absence of innocent association. See United States v. Zackson, 12 F.3d 1178, 1182–83 (2d Cir. 1993) (ruling evidence of appellant's prior involvement with the co-defendant in a marijuana trafficking and conspiracy properly admitted under Rule 404(b) as relevant to intent and to rebut defense of innocent association); see also United States v. Howell , 231 F.3d 615, 628–29 (9th Cir. 2000) (admitting evidence of appellant's previous drug-trafficking convictions under Rule 404(b) to rebut claimed innocent motive for being present where drugs were found); United States v. Williams, 31 F.3d 522, 527 (7th Cir. 1994) (ruling evidence r egarding appellant's prior drug smuggling was properly admitted in a drug-trafficking conspiracy prosecution to rebut defense that he was merely an innocent Spanish interpreter for a co-conspirator).

at P18. Because oxycodone, the controlled substance in Endocet, is not one for which the Sentencing Guidelines' Drug Quantity Table provides a base of fense level by unit of weight, the Probation Office looked to the Drug Equivalency Tables found in Application Note 10 of S 2D1.1. U.S. Sentencing Guidelines Manual, S 2D1.1(c) (1998);6 PSR P17. According to those tables, one gram of oxycodone is equivalent to 500 grams of marijuana, resulting in this case to an equivalency of 7,245 kilograms of marijuana. PSR P18. The base offense level for this quantity is 34. See U.S. Sentencing Guidelines Manual, S 2D1.1(c)(3). The District Court overruled Butch's objection to the PSR's calculation of drug quantity attributable to him "because the PSR accurately reflects the appropriate drug equivalency calculation under the United States Sentencing Guideline Section 2D1.1." The District Court imposed a two-level enhancement to this base level for Butch's r ole as a manager or supervisor of the offense pursuant to S 3B1.1(c) of the Sentencing Guidelines. The District Court then found Butch's criminal history category to be IV. See PSR PP 56–83.7 The effective Sentencing Guideline range was 262 to 327 months. However, given the statutory maximum penalty of 240 months, the District Court sentenced Butch to the statutory maximum pursuant to S 5G1.1 of the Sentencing Guidelines, which provides that "wher e the statutorily authorized maximum sentence is less than the minimum of the applicable guideline range, the statutorily authorized maximum sentence shall be the guideline sentence."

In support of his argument, Butch cites to Amendment 517 to the Sentencing Guidelines,8 applicable to Schedule I

_____

6. The 1998 edition of the Sentencing Guidelines is applicable in this case.

7. Butch does not challenge either of these deter minations on appeal.

8. Amendment 517

    modifies S 2D1.1 . . . with respect to the determination of the offense
    levels for Schedule I and II Depressants . . . by applying the Drug
    Quantity Table according to the number of pills, capsules or tablets
    rather than by the gross weight of the pills, capsules or tablets.
    . . . The current guidelines use the total weight of the pill, capsule,
    or tablet containing the controlled substance. This method leads to

or II Depressants, which equates one unit or one pill to one gram of marijuana (as opposed to the 500 grams of marijuana figure used by the District Court). He argues that because, under the language of 28 C.F.R.S 1308.12(e), oxycodone acts like a depressant and is not specifically excepted or listed in another schedule, oxycodone qualifies as a Schedule II Depressant. If this pr ovision of the Drug Equivalency Table were followed as Butch suggests, the drug equivalency would equal 26.4 kilograms of marijuana, not 7,245 kilograms. The resultant base of fense level would then be 18. Alternatively, using the net weight of the oxycodone would result in an equivalency of 59 kilograms of marijuana and a base offense level of 20. Butch invokes the rule of lenity9 to resolve the alleged ambiguity in the Sentencing Guidelines with respect to the calculation of the drug equivalency of oxycodone after Amendment 517.

Butch's argument fails for two reasons. His assertion that the net controlled substance should be used in determining the base offense level is directly contrary to Application Note A to the Drug Quantity Table, which pr ovides that "[u]nless otherwise specified, the weight of a controlled substance set forth in the table refers to the entire weight of a mixture or substance containing a detectable amount of the controlled substance." See U.S. Sentencing Guidelines Manual, S 2D1.1(c), cmt. n.A. Mor eover, this argument was expressly rejected by this Court in United

_____

anomalies because the weight of most pills is deter mined primarily by the filler rather than the controlled substance. Thus, heavy pills lead to higher offense levels even though ther e is little or no relationship between gross weight and the potency of the pill. Applying the Drug Quantity Table accor ding to the number of pills will both simplify guideline application and mor e fairly assess the scale and seriousness of the offense.

Appendix C to the U.S. Sentencing Guidelines Manual, November 1, 1997, p. 341 ("Appendix C").

9. The rule of lenity provides that "when ambiguity in a criminal statute cannot be clarified by either its legislative history or inferences drawn from the overall statutory scheme, the ambiguity is resolved in favor of the defendant." United States v. Pollen, 978 F.2d 78, 85 (3d Cir. 1992) (citing Rewis v. United States, 401 U.S. 808, 812 (1971)).

11

States v. Gurgiolo, 894 F.2d 56 (3d Cir. 1990), wherein we reversed the District Court's calculation of the applicable drug quantity based on the net weight of the oxycodone in Percocet pills.

> Indeed, Congress requires the whole drug to be weighed when the drug consists at least in part of a detectable amount of Schedule I substances, such as LSD and heroin, which are the most danger ous substances available. . . . In short, where Congress provides for full-weight conversion of Schedule I, III and IV substances, there is no self-evident r eason to conclude that it meant to treat Schedule II drugs differently.

Id. at 61.10

Second, oxycodone is not a Schedule II Depressant. It is a Schedule II Opiate, a classification distinguishable from Schedule II Depressants. See 21 U.S.C.S 812; 21 C.F.R. S 1308.12(b)(1); U.S. Sentencing Guidelines Manual, S 2D1.1(c). Consequently, Amendment 517 does not operate to require that oxycodone be converted into a drug equivalency based on the number of pills as opposed to its weight. Although Butch is correct that the Amendment replaced the marijuana drug equivalencies for Schedule I and II Depressants with a provision that one unit (pill,

_____

10. The other Circuit Courts of Appeals to consider this issue are in agreement. See United States v. Limber opoulos, 26 F.3d 245, 252-53 (1st Cir. 1994) (concluding Application Note A applies to Percodan, Percocet and Valium); United States v. Meitinger , 901 F.2d 27, 29 (4th Cir. 1990) (ruling the same with respect to Dilaudid, containing the active ingredient hydromorphone, a Schedule II Opiate), cert. denied, 498 U.S. 531 (1990); United States v. Blythe, 944 F .2d 356, 362 (7th Cir. 1991) (same); United States v. Young, 992 F .2d 207 (8th Cir.1993) (holding that the weight of the entire tablet and not just the amount of the illegal hydromorphine contained therein should be used to compute the defendant's sentence); United States v. Cr owell, 9 F.3d 1452, 1454-55 (9th Cir. 1993) (same); United States v. Lazarchik, 924 F.2d 211, 214 (11th Cir. 1991) (concluding the same with r espect to hydrocodone (Tussionex) and diazepam (Valium)), cert. denied, 502 U.S. 827 (1991); United States v. Shabazz, 933 F.2d 1029, 1032-33 (D.C. Cir. 1991) (ruling that Application Note A applies to Dilaudid), cert. denied, 502 U.S. 964 (1991).

12

capsule or tablet) equals one gram of marijuana, the Amendment by its own terms does not extend to Schedule II Opiates. Appendix C at 340. The Congressional intent behind Amendment 517 is clear. Congress specifically excepted Schedule I and II Depressants, not Schedule I and II Opiates. Had Congress intended to modify the Guidelines with respect to the latter, it would have done so. Those Circuit Courts of Appeals to consider the issue, albeit in unpublished form, have come to the same conclusion. See United States v. Carruthers, 215 F.3d 1328, 2000 WL 712382, *2 (6th Cir. 2000) (unpublished opinion); United States v. Flores, 112 F.3d 506, 1996 WL 599798, *2 (2d Cir. 1996) (unpublished opinion). As the Sixth Cir cuit explained:

> Congress only intended to make an exception for Schedule I or II Depressants[,] not Schedule I or II Opiates–the category to which hydromorphones belong. Had it intended to make an exception for Opiates to be measured by their active ingredients as opposed to the gross weight of the drug, Congress pr esumably would have done so. . . . . Amendment 517 was enacted to clarify the law with respect to Schedule I and II Depressants and Schedule III, IV and V contr olled substances. Nothing more can be gleaned fr om the Amendment. Therefore, Defendant's contention that the legislative intent is inconsistent with the statute must fall.

Carruthers, 215 F.3d 1328, 2000 WL 712382 at *2.

Moreover, no ambiguity exists in the operation of the Sentencing Guidelines with respect to oxycodone. The Drug Equivalency Tables provide that one gram of oxycodone is equivalent to 500 grams of marijuana. See U.S. Sentencing Guidelines Manual, S 2D1.1(c) (1998). Ther efore, Butch's reliance on the rule of lenity is misguided. United States v. Johnson, 529 U.S. 53, 59 (2000) ("Absent ambiguity, the rule of lenity is not applicable to guide statutory interpretation."); Muscarello v. United States, 524 U.S. 125, 138–39 (1998) ("The rule of lenity applies only if, after seizing everything from which aid can be derived . . . we can make no more than a guess as to what Congr ess intended. . . . To invoke the rule, we must conclude that

13

there is a grievous ambiguity or uncertainty in the statute.").

In summary, we can find no error in the District Court's determination of the quantity of oxycodone attributable to Butch, nor in the application of the Sentencing Guidelines to this determination.

IV.

Butch's final argument on appeal is that the District Court erred by failing to submit the weight of the controlled substance to the jury for a factual determination beyond a reasonable doubt in light of Apprendi v. New Jersey, 530 U.S. 466 (2000). The preliminary issue is whether Apprendi even applies to cases in which judicial factfinding at sentencing increases the Sentencing Guideline range, and thus the potential sentence, above the statutory maximum, but the actual sentence imposed is equal to the statutory maximum. Because Butch did not raise this claim in the District Court at sentencing, we review his challenge for plain error. United States v. Mack , 229 F.3d 226, 234–35 & n.12 (3d Cir. 2000).

Our recent decision in United States v. W illiams, 235 F.3d 858 (3d Cir. 2000) controls this case. In Williams, the appellant argued that Apprendi was implicated because the trial court's finding of drug quantity incr eased the prescribed range of penalties and the maximum penalty to which he was exposed, even though his actual penalty did not exceed 20 years. Id. at 863. We ruled that "Apprendi is not applicable to [Appellant's] sentence, because the sentence actually imposed . . . was well under the original statutory maximum of 20 years." Id. at 863 (relying on Mack, 229 F.3d 226).

In Mack, Chief Judge Becker prescribed a two-step "Apprendi inquiry" under which

> [a] court must first determine the"prescribed statutory maximum" sentence for the crime of which the defendant was convicted and assess whether the defendant's ultimate sentence exceeded it. If it did, the court must consider . . . whether the enhanced

14

sentence was based on "the fact of a prior conviction." If it was, then the sentence is constitutional. If it was not, then the sentence is unconstitutional.

Id. at 237. Just as in Williams, Butch's claim fails to get past step one because the ultimate sentence imposed by the District Court did not exceed the "pr escribed statutory maximum" of 20 years. Apprendi is therefore not implicated.

V.

For the foregoing reasons, we will affir m Mr. Butch's conviction and sentence.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

15