NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 10-3905
_____

UNITED STATES OF AMERICA

v.

AKOUAVI KPADE AFOLABI,
a/k/a GLORIA LAWSON,
a/k/a SISTER,
a/k/a SELINA,

Appellant.
_____

Appeal from the United States District Court
for the District of New Jersey
(D.C. Criminal No. 2:07-cr-00785)
District Judge: Honorable Jose L. Linares
_____

Submitted Under Third Circuit LAR 34.1(a)
April 13, 2012

Before:  McKEE, *Chief Judge,* HARDIMAN, *Circuit Judge*
and JONES, II,* *District Judge*.

(Opinion Filed: January 4, 2013 )
_____

OPINION OF THE COURT
_____

---

* The Honorable C. Darnell Jones, II, District Judge for the United States District Court for the Eastern District of Pennsylvania, sitting by designation.

Jones, II, *District Judge*.

Akouavi Kpade Afolabi (also known as "Gloria Lawson," "Sister" or "Selina") ("Afolabi") was convicted in the district court on 22 counts relating to her participation in visa fraud and human trafficking.[1] Afolabi contends that the district court erred in admitting certain evidence under Federal Rule of Evidence 404(b) and in denying her motion for a judgment of acquittal. She requests that this Court vacate the judgment of conviction on the forced labor and trafficking counts and remand for re-sentencing on the remaining convictions; alternatively, Afolabi requests a remand for a new trial on all counts.[2] For the reasons set forth below, we decline, and thus we affirm the judgment.

## I.  Background

As we write solely for the parties, we recite only those facts necessary to our decision.

From October 2002 through September 2007, Afolabi (a citizen of the West African nation of Togo), her former husband and her son brought more than 20 West African girls, aged 10 to 19, from poor villages in Togo and Ghana into the United States on fraudulently obtained visas, under the pretense that the girls would go to school or

---

[1] On October 14, 2009, a jury convicted Afolabi of one count of conspiracy to commit visa fraud, in violation of 18 U.S.C. § 371; five counts of visa fraud, in violation of 18 U.S.C. §1546(a); four counts of smuggling illegal aliens, in violation of 8 U.S.C. § 1324(a)(2)(B)(ii); one count of conspiracy to commit forced labor, trafficking with respect to forced labor, and document servitude, in violation 18 U.S.C. § 371; five counts of forced labor, in violation of 18 U.S.C. § 1589; five counts of trafficking with respect to forced labor, in violation of 18 U.S.C. § 1590; and one count of conspiracy to harbor aliens, in violation of 8 U.S.C. § 1324(a)(1)(A)(v)(I). On September 23, 2010, Afolabi was sentenced to 324 months' imprisonment and three years' supervised release.

[2] The district court had jurisdiction under 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 1291.

learn a trade.[3]  (Government's Supplemental Appendix ("SA") 71, 202, 562, 621.)

Instead, the girls worked in hair-braiding salons for up to 16 hours a day, six or seven

days a week, and turned over all their earnings to the Defendants.  (SA78, 80-82, 232-39,

248-56, 360, 372-77, 567, 635-41, 1243-48.)

At Afolabi's trial, the Government introduced evidence that the girls were

physically, psychologically and sexually abused in both Africa and the United States.

Afolabi and her co-conspirators beat the girls, sometimes at length and with extreme

violence, to ensure their compliance.  (Appellant's Appendix ("A") 87-88, 153, 155-56;

SA56, 88, 258, 284, 365, 372, 379, 570, 575-76, 600-01, 618, 621, 1248.)  Afolabi's

former husband forced at least three of the girls to have sex with him and transported

another girl, who was under the age of 18, from New Jersey to North Carolina in order to

have sex with her.  (SA 382, 385-86, 668.)  When the girls tried to tell Afolabi about

these sexual assaults, Afolabi either refused to listen to them or blamed them for the

assaults.  (SA321, 577.)

In order to demonstrate the involuntary nature of the girls' servitude in the United

States, the Government also produced evidence that Afolabi and her co-conspirators

---

[3] Afolabi's former husband, Lassissi Afolabi, pled guilty to two forced labor and conspiracy counts, as well as transportation of a minor with intent to engage in criminal sexual activity.  *United States v. Afolabi*, Crim. No. 07-785 (JLL) (D.N.J. Aug. 26, 2009) (Dkt. No. 120).  He was sentenced on July 22, 2010 to 292 months' imprisonment; his sentence was affirmed by this Circuit on December 16, 2011.  *United States v. Afolabi*, 455 F. App'x 184, 187 (3d Cir. 2011).  Son Dereck Hounakey pled guilty to a forced labor conspiracy count and was sentenced to 55 months' imprisonment; another relative, Bernard Hounakey, pled guilty to two conspiracy and visa fraud counts and was sentenced to time served.  Neither Hounakey appealed.  *See United States v. Hounakey*, Crim. No. 08-529 (JLL) (D.N.J. Mar. 13, 2009) (Dkt. No. 21); *United States v. Hounakey*, Crim. No. 07-785 (JLL) (D.N.J. June 28, 2010) (Dkt. No. 195).  Co-defendant Geoffry Kouevi's case was severed, and he was convicted at trial of two conspiracy and visa fraud counts; he was sentenced to 26 months' imprisonment.  *United States v. Kouevi*, Crim. No. 07-785 (JLL) (D.N.J. Aug. 18, 2010) (Dkt. No. 208).  His conviction and sentence were recently affirmed.  *United States v. Kouevi*, Civ. No. 10-3529, 2012 WL 5235260, at *11-12 (3d Cir. Oct. 24, 2012).

isolated the girls from their families, exploited their youth and lack of knowledge of English, and induced deep fear and shame at the prospect of being returned to Africa in disgrace. (SA83-84, 87-88, 247, 256, 261, 278, 671-72.) Afolabi and her co-conspirators confiscated the girls' passports and other identification to prevent their independent travel. (A132, SA268, 371, 380-81.) On the extremely rare occasions that the girls were permitted to speak to their families in Africa, they were pressed into lying about their whereabouts; one girl was forced to tell her parents she was succeeding in school (which she was in fact not allowed to attend), and another that she was living in Germany. (SA371, 569.) The girls testified at trial that they were unable to leave Afolabi's control because they feared her, did not know anyone else, possessed no documentation, and believed Afolabi would "do something to harm" their families. (SA278, 381, 674, 679.) Indeed, one girl testified that Afolabi's treatment prompted her to contemplate suicide. (SA286.)

### A. Admission of Contested Evidence

The Government sought to introduce evidence that, while in Togo, Afolabi beat the girls and demonstrated voodoo practices in order to threaten and intimidate them. Although these acts had occurred prior to the indictment period, the Government contended that they continued to have a coercive effect on the girls even after they had arrived in the United States. Over Afolabi's objections, the district court admitted such evidence as both intrinsic to the forced labor and trafficking charges and pursuant to Federal Rule of Evidence 404(b). The district court judge reasoned that under Rule

4

404(b), the Togo evidence was probative of a scheme or plan to lead the victims to believe that "serious harm would result to them if they attempted to disobey the defendant." (A2.) He determined that the temporal discrepancy between the Togo acts and the United States acts—up to two years—was not enough to defeat the Togo acts' admissibility. (A2.) The judge noted that:

> even though the Government may have additional evidence of this conduct [the scheme or plan to intimidate the girls into labor] that they may introduce during the trial, it is not the type of situation where one would say, well, the evidence is so prejudicial, that in light of all of the other favorable evidence that the Government already has anyway, we should err on the side of not admitting the evidence.
> I think under the circumstances of this case, the evidence is admissible. I think cases that have dealt with this issue and similar cases that have dealt with the issue of voodoo rituals, et cetera, like the other case we discussed earlier, have admitted the evidence.

(A2-3.)

Accordingly, a victim named Vida testified that Afolabi beat her with a branch and a cane on three different instances in Togo, after Afolabi accused Vida of taking too long to bring a refrigerator repairman to Afolabi's house, having inappropriate relations with a village man, and not preparing Afolabi's shower to the desired heat level. (A87-88.) Vida also stated that she witnessed Afolabi beat another girl named Rose because Rose had taken Vida to visit a friend, against Afolabi's prohibition. (A88.)

Vida further testified about a "little room" in Afolabi's Togo house furnished with "handmade stuff" that Vida called "vedzu"—voodoo—which Vida understood to be "like a god" that could be used by its followers "to scare you…to make you crazy…to kill you

5

with it." (A98.) Vida described a pot in the room used for sacrificing chickens. (A98-99.) She also testified that Afolabi introduced her to a man named Pele, who tried to feed her "nut kola" and water. Pele told Vida that the nut kola would bind her to Afolabi in the United States; if Vida did not want to stay with Afolabi and tried to leave, she was "going to go crazy." (A99.)

However, when questioned on direct examination as to what she had believed would happen to her if she refused to work for Afolabi once she arrived in the United States, Vida responded only that she feared Afolabi would become angry and send her back to Togo. (A103.) Even when pressed, Vida did not testify as to any other fears of corporal or voodoo punishment. (A132.)

A second victim witness, Sroda, also testified to Afolabi's entering the "little room" in her Togo home and talking to herself, which Sroda understood to be part of Afolabi's voodoo practices:

> To me, voodoo is the worst thing, the worst thing to worship because it is just—I don't like it. The thought of voodoo, it just breaks me down, and I don't know how someone would want to worship a voodoo instead of God, and I have seen lots of things happen through voodoo to other people, and it is not a good thing. There are so many things that could happen with voodoo.
> …[P]eople can use voodoo to make people physically or emotionally paralyzed. Mostly they can make them blind and stop hearing and get talking problem [sic]. They can use voodoo to stop somebody from talking, and the common one is killing.
> …Because from what I know of voodoo, voodoo doesn't bring you any good thing or anything good from my point of view, so that is, it is better just to go with God. That is how I perceive it.

6

(A130.) Sroda went on to describe voodoo rituals she had seen that included animal sacrifices, and voodoo-induced blindness and paralysis she had heard about from family members, but testified that she did not witness any such sacrifices or other voodoo practices in Afolabi's house. (A130, 134.)

The third victim to testify, Ameyo, confirmed Afolabi's Togo beatings of Vida and another girl, Doveni. (A142.) Ameyo also discussed the existence of Afolabi's "room for voodoo" in Togo, with "little voodoo dolls," but she did not witness any particular acts within the room. (A142.) Once in the United States, Ameyo did refuse to follow Afolabi's order to relocate from Afolabi's then-husband's house; when pressed at trial as to whether she was afraid of "voodoo magic" being practiced against her as punishment, Ameyo replied, "I don't know." (A146.)

The fourth victim, Ahoefa, testified that she saw Afolabi hit Vida and another girl, Ajnele, and saw "something like a statute [sic] and like a stone" in Afolabi's "voodoo" room. (A153.) Ahoefa also testified that Afolabi took her to a voodoo priest, who killed a chicken and goat and spread the animals' blood "on the voodoos." (A154.)

### B. *Limiting Instruction and Motion for Judgment of Acquittal*

Following Vida's testimony on direct examination, the district court judge issued a limiting instruction to the jury—an instruction that Afolabi agreed was proper:

> Remember at the beginning of the trial, I said to you that from time to time evidence would come in for a limited purpose, and I would explain it to you, and you could only consider that evidence for a limited purpose.
> Some of the testimony that you heard here today pertained to other acts or wrongs or crimes that were committed in Togo. You remember

there was some evidence or testimony from the witness about some religious rituals that occurred there or some punishment that may have occurred there.

Now, normally other wrongs or acts or evidence of other crimes are generally not admissible to prove the character of the defendant, or in order to show that the defendant had some propensity to commit a crime. Just because she did something wrong in the past doesn't make you [sic] guilty of something today. Except that other wrongs or acts evidence is admissible for your consideration with regard to some particular issues such as intent, a plan or a scheme, or knowledge or the absence of a mistake or accident in the commission of a crime.

In this particular case, that evidence was introduced for those purposes, so you can consider what other acts or wrongs that may have happened in Togo with regard to making the decision as to whether the defendant was involved in some scheme or plan or intent and for the issues of the absence of mistake or accident with regard to the charges of forced labor.

(A105; SA89 (Afolabi's agreement to instruction).)

Following the presentation of the Government's case, Afolabi moved for a judgment of acquittal, which was denied. While not specifically mentioning the evidence of corporal punishment and of voodoo practices in Togo, the district court judge made the following statement with regard to the charges of forced labor and trafficking in forced labor:

Looking at the totality of the evidence that came in in this case and the circumstances, although certainly one can argue that things were, as [Afolabi's counsel] claims they were, a reasonable jury could just as easily find that as part of the scheme, the girls saw punishment that was meted out to those who disregarded the rules, that they were present when rituals were done, wherein they were threatened with harm, if they didn't abide by the wishes of the defendant and her husband I guess.

(A25.)

On appeal, Afolabi now argues that the admission of the evidence relating to corporal punishment and voodoo rituals in Togo, even with the limiting instruction, represented an abuse of the district court's discretion. Afolabi maintains that none of the girls testified that she was intimidated in the United States by her experiences in Togo, and that the contested evidence substantially harmed Afolabi's defense. In addition, Afolabi contends that without the Togo evidence, the Government failed to establish the girls' fear such as to satisfy the necessary element of the forced labor and trafficking charges.

## II.    Standards of Review

We generally review a district court's evidentiary rulings for abuse of discretion. *United States v. Green*, 617 F.3d 233, 239 (3d Cir. 2010). "An abuse of discretion occurs only where the district court's decision is 'arbitrary, fanciful, or clearly unreasonable'— in short, where 'no reasonable person would adopt the district court's view.'" *Id.* (quoting *United States v. Starnes*, 583 F.3d 196, 214 (3d Cir. 2009)). However, to the extent that the district court's rulings were "'based on a legal interpretation of the Federal Rules of Evidence, we exercise plenary review.'" *Id.* (quoting *Complaint of Consolidation Coal Co.*, 123 F.3d 126, 131 (3d Cir. 1997)). "This includes plenary review 'of whether evidence falls within the scope of Rule 404(b).'" *Id.* (quoting *United States v. Cruz*, 326 F.3d 392, 394 (3d Cir. 2003)).

We exercise plenary review over a district court's determination that there was sufficient evidence to support the jury's verdict. *United States v. Bornman*, 559 F.3d

150, 152 (3d Cir. 2009). In considering whether there was sufficient evidence, we must view the evidence in the light most favorable to the Government, and "must affirm the conviction[] if a rational trier of fact could have found defendant guilty beyond a reasonable doubt." *United States v. Coyle*, 63 F.3d 1239, 1243 (3d Cir. 1995). We reverse only when there is "'no evidence, regardless of how it is weighted, from which the jury could find guilt beyond a reasonable doubt.'" *United States v. Mussare*, 405 F.3d 161, 166 (3d Cir. 2005) (quoting *United States v. Anderson*, 108 F.3d 478, 481 (3d Cir. 1997)).

### III.     Admission of Evidence

To prove that Afolabi committed, and conspired to commit, forced labor and/or trafficking with respect thereto, the Government had to establish, *inter alia*, that Afolabi knowingly joined the conspiracy to procure, and that she herself procured, the girls' labor by means of "force, threats of force, physical restraint or threats of physical restraint;" "serious harm or threats of serious harm;" or "any scheme, plan, or pattern intended to cause [the girls] to believe that, if [they] did not perform such labor or services, [they] would suffer serious harm or physical restraint." 18 U.S.C. § 1589; *see* 18 U.S.C. §§ 371, 1590. "Serious harm," in turn, "refers to a broad array of harms, including both physical and nonphysical." H.R. CONF. REP. 106-939, at 101 (2000). Section 1589 is "intended to be construed with respect to the individual circumstances of victims that are relevant in determining whether a particular type or certain degree of harm or coercion is

10

sufficient to maintain or obtain a victim's labor or services, including the age and background of the victims." *Id.*

Accordingly, the Government sought to introduce evidence that Afolabi used voodoo to threaten and intimidate the girls as intrinsic to those charges. Evidence is intrinsic in two circumstances: (1) if it "directly proves the charged offense;" or (2) if it is of an "uncharged act, performed contemporaneously with the charged crime" that "facilitate[s] the commission of the charged crime." *United States v. Green*, 617 F.3d 233, 248-49 (3d Cir. 2010). The evidence at issue here, however, does not seem to fall into either category.

As to the first circumstance, the evidence does not "directly prove" the charged offense, as it is not evidence of "an act that is part of a charged offense." *Id.* at 248 (quoting *United States v. Bowie,* 232 F.3d 923, 929 (D.C. Cir. 2000)). The Government sought to introduce testimony about conduct (corporal punishment and threats) that took place before Afolabi engaged in the criminal conduct alleged in the indictment, and so this testimony cannot be testimony about "an act that is part of a charged offense." Nor does the evidence satisfy the second circumstance. Although the evidence may have facilitated the commission of the crime, it was not "performed contemporaneously with the charged crime."

If not intrinsic to a charge, evidence of other acts or crimes must be considered under Federal Rule of Evidence 404(b). *Green*, 617 F.3d at 249. Evidence of uncharged crimes or wrongs may be admitted under Rule 404(b) if it (1) has "a proper evidentiary

purpose;" (2) is "relevant;" (3) satisfies Rule 403;[4] and (4) is "accompanied by a limiting instruction (where requested) about the purpose for which the jury may consider it." *Green*, 617 F.3d at 249 (citing *United States v. Butch*, 256 F.3d 171, 175 (3d Cir. 2001)). Here, the district court judge issued a limiting instruction, which Afolabi agreed was proper, and the Togo evidence satisfied the other requirements as well.

First, the Government introduced the contested evidence for several proper purposes*, i.e.*, purposes "'probative of a material issue other than character.'" *Green*, 617 F.3d at 250 (quoting *Huddleston v. United States*, 485 U.S. 681, 686 (1988)). Despite Afolabi's contention that "[n]o girl arrived in this country with any fear of rape because of an observation in Togo or with a fear of a blindness due to voodoo retaliation," (App. Br. at 46), the district court judge reasonably concluded that the Togo evidence served to illustrate Afolabi's plan, scheme, and/or absence of mistake in pressing the victims into her service. The contested evidence included more than "testimony that voodoo was not uncommon in Togo" (App. Br. at 47); it suggested that Afolabi intended for her victims to believe they were "going to go crazy" if they attempted to leave Afolabi's control in the United States.

Second, along similar lines, the Togo evidence was relevant to the forced labor charges and Afolabi's underlying intimidation of the victims. Even where the victims did not testify to fear of voodoo as binding them to Afolabi in the United States, such

---

[4] Rule 403 permits the court to exclude relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

evidence could be weighed by the jury as to whether the voodoo threats contributed to the girls' inability to leave.

Third, the evidence satisfies Rule 403 because any potential prejudice resulting from the Togo evidence did not substantially outweigh its probative value. *See* Fed. R. Evid. 403. As noted above, the voodoo rituals that Afolabi engaged in had significant probative value. Afolabi's conduct was suggestive of a general scheme or plan to frighten the girls into staying with her, and the jury could have reasonably concluded that Afolabi's threats made it more difficult for the girls to leave. Although we recognize that the evidence of voodoo-related rituals could have had a prejudicial effect on the jury, the District Court carefully considered this issue, and its determination that any potential prejudice did not substantially outweigh the probative value of the evidence was neither arbitrary nor irrational. *See United States v. Lee*, 612 F.3d 170, 184 (3d Cir. 2010).

Finally, the district court judge provided an appropriate limiting instruction, which Afolabi herself approved.[5] We presume that the jury followed the trial judge's instruction. *United States v. Hakim*, 344 F.3d 324, 326 (3d Cir. 2003). While this Court recognizes the potential for prejudice under the circumstances, it notes that the district court recognized such potential as well, and weighed it carefully. *See United States v. Reme*, 738 F.2d 1156, 1164-65 (11th Cir. 1984) (deferring to trial court's discretion to

---

[5] Furthermore, with respect to the Togo acts and their effect on the victims, Afolabi's counsel did not request a hearing with witnesses under oath outside the jury's presence. (Appellant's Brief ("App. Br.") at 48.) In fact, Afolabi's counsel acknowledges the "practical problems" raised by such a hearing, in light of the fact that some victims did not reside within the court's district at that time and that the trial took 19 days with a jury in the courtroom. (*Id.*)

13

admit "highly probative" voodoo evidence to establish element of control in transportation of illegal aliens into United States and noting thorough limiting instruction).

### IV. Sufficiency of Evidence

In any event, even if the Togo evidence's probative value were substantially outweighed by its prejudicial effect and thus should have been excluded, its admission remained ultimately harmless. The contested testimony was but one piece of the overwhelming evidence of Afolabi's coercion of her victims. *See United States v. Cross*, 308 F.3d 308, 326-27 (3d Cir. 2002) (prejudicial effect of cumulative "other acts" evidence did not unduly influence ultimate guilty verdict in face of other "overwhelming" evidence).

Afolabi argues that without the Togo evidence, the Government failed to prove an element of its forced labor and trafficking counts. However, even if the district court judge had disallowed the testimony relating to Afolabi's corporal punishment and voodoo practices in Togo, or the jury had determined that the victims were not actually intimidated in the United States by Afolabi's alleged abuses in Togo, the Government presented sufficient other evidence of Afolabi's intimidation of the victims once they arrived in the United States to support the jury's guilty verdict.

Five victims testified at trial that despite promises of schooling upon arrival in the United States, they were forced to work 60 to 100 hours per week for several years and to hand over all earnings from the hair-braiding salons where they worked. They testified

14

that they did so because Afolabi and her co-conspirators (1) separated them from their families, any school community, funds, or identifying documents; (2) threatened to deport them to Africa and to beat them violently; and (3) in fact did assault and beat them, with various implements. This was enough for a jury to find that the Government had satisfied its burden, regardless of the Togo evidence. *See, e.g.*, *United States v. Djoumessi*, 538 F.3d 547, 552 (6th Cir. 2008) (defendant's threats to send victim back to Cameroon were coercive in light of victim's particularly vulnerable status as illegal alien). Indeed, the district court judge here acknowledged as much in considering the admission of the Togo evidence, noting that said evidence was not unreasonably prejudicial upon consideration of the Government's other cumulative evidence.

## V. Conclusion

For these reasons, we affirm.