RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 14a0170p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

No. 13-1441

JEAN CLAUDE KODJO TOVIAVE,

*Defendant-Appellant.*

─────────────────

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:11-cr-20259-1—Arthur J. Tarnow, District Judge.

Argued: May 7, 2014

Decided and Filed: August 4, 2014

Before: SUHRHEINRICH, ROGERS, and SUTTON, Circuit Judges.

─────────────────

### COUNSEL

─────────────────

**ARGUED:** Christopher Keleher, THE KELEHER APPELLATE LAW GROUP, Chicago, Illinois, for Appellant. Mollie E. O'Rourke, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellee. **ON BRIEF:** Christopher Keleher, THE KELEHER APPELLATE LAW GROUP, Chicago, Illinois, for Appellant. Mollie E. O'Rourke, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellee.

─────────────────

### OPINION

─────────────────

ROGERS, Circuit Judge. Child abuse is a state crime, but not a federal crime. Forced labor is a federal crime, 18 U.S.C. § 1589, but the statute obviously does not extend to requiring one's children to do their homework, babysit on occasion, and do household chores. Only by

1

bootstrapping can this combination of two actions that are not federal crimes—child abuse and requiring children to do household chores—be read as a federal crime.

Defendant Toviave brought four young relatives from Togo to live with him in Michigan. After they arrived, Toviave made the children cook, clean, and do the laundry. He also occasionally made the children babysit for his girlfriend and relatives. Toviave would beat the children if they misbehaved or failed to follow one of Toviave's many rules. While his actions were deplorable, Toviave did not subject the children to forced labor. The mere fact that Toviave made the children complete chores does not convert Toviave's conduct—what essentially amounts to child abuse—into a federal crime. Toviave's federal forced labor conviction must accordingly be reversed.

Toviave immigrated to the United States from Togo in 2001 and eventually settled in Michigan. In 2006, he contacted Helene Adoboe, a girlfriend (sometimes referred to as his wife) from Togo, and asked that she and four children—Gaelle, Rene, Kwami, and Kossiwa—come and live with him in the United States. Kossiwa is Toviave's younger sister, Gaelle and Rene are Toviave's cousins (although their degree of consanguinity is unclear), and Kwami is Adoboe's nephew. Adoboe and the children managed to enter the United States with false immigration documents. Adoboe initially lived with Toviave, but their relationship quickly soured, and the two separated in 2008.

Toviave apparently demanded absolute obedience from the children and was quick to beat them. Toviave hit the children with his hands, and with plunger sticks, ice scrapers, and broomsticks, often for minor oversights or violations of seemingly arbitrary rules. For example, Gaele testified that Toviave hit her in the face for using loose-leaf paper rather than a notebook to do her homework, and Kossiwa recounted an incident where Toviave hit her with a broomstick for throwing a utensil in the sink.

The children were responsible for different household chores. Toviave made the children cook, clean, and do the laundry. He also made the children pack up the house when the family moved to a new apartment, serve food to Toviave's guests, iron Toviave's clothes, and clean his van. Toviave also occasionally made the children babysit for the women he was dating, or for his relatives.

Toviave was not always cruel, however. He provided for the children by working two jobs, and also did yard work. Toviave bought the children sports equipment and let them play soccer. The children also participated in some recreational activities with Toviave: they exercised with him and went on family trips together. Toviave also put significant emphasis on education; many of his punishments appear to have stemmed from problems related to schoolwork. He hired a tutor to teach the children English. He also imposed mandatory study periods: the children had to be at the kitchen studying at 5:30 a.m. on school days. The children always attended school, and Toviave even created extra assignments and drills for the children to complete when they finished their school assignments.

Eventually, the children's teachers began to suspect that the children were being abused. Michigan authorities caught wind of the allegations of abuse and began investigating Toviave. The children were eventually removed from the house. The federal government became involved when a Michigan investigator began to suspect that the children had been brought into the United States illegally. Agents with the Department of Homeland Security obtained a search warrant and discovered false immigration documents in Toviave's home. Some time later, a grand jury indicted Toviave on charges of visa fraud, mail fraud, forced labor, and human trafficking. Toviave pled guilty to the visa and mail fraud charges, and the government dropped the trafficking charge. Toviave proceeded to trial on the forced labor charges. During the trial, a juror asked the court, "Why is this [case] not tried under the child abuse laws?" The court answered, "Child abuse laws are state laws, and there's no reason that it couldn't be tried under both." Toviave was eventually convicted on four counts with respect to the four children. He appeals.

Although Toviave's treatment of the children was reprehensible, it was not forced labor. Three points compel this conclusion. First, forcing children to do household chores cannot be forced labor without reading the statute as making most responsible American parents and guardians into federal criminals. Second, requiring a child to perform those same chores by means of child abuse does not change the nature of the work. And third, if it did, the forced labor statute would federalize the traditionally state-regulated area of child abuse. In short, treating household chores and required homework as forced labor because that conduct was

enforced by abuse either turns the forced labor statute into a federal child abuse statute, or renders the requirement of household chores a federal crime.

Apart from the abuse, the facts here amount to nothing more than household chores. Toviave made the children clean the house weekly. This included washing the floors, windows, and bathrooms, and doing dishes. Toviave also tasked the children with preparing food and doing laundry. On one occasion, the family moved, and Toviave forced the children to do all of the packing. Finally, Toviave made the children babysit for his friends and relatives. None of this conduct goes beyond what a parent or guardian can expect from his child.

An American parent has always had the right to make his child perform household chores. That right is codified in Michigan: "parents . . . are . . . entitled to the custody, control, services and earnings of [a] minor." Mich. Comp. Laws § 722.2; *see also Rohm v. Stroud*, 194 N.W.2d 307, 308 (Mich. 1972). A person standing *in loco parentis*, or "in the place of a parent; instead of a parent; charged, factitiously, with a parent's rights, duties, and responsibilities" also has that right. *Hush v. Devilbiss Co.*, 259 N.W.2d 170, 174 n.1 (Mich. Ct. App. 1977). This principle reappears in different areas of the law. For example, child labor laws often do not apply to domestic work or chores. *See, e.g.*, Mich. Comp. Laws § 409.119(a); 29 C.F.R. § 570.126. A parent is also entitled to compensation for the value of his or her child's services in a tort action. *See Rohm*, 194 N.W.2d at 309. "In most states, as at common law, gainful employment neither guarantees minor children the right to receive their earnings nor provides them with a cause of action to recover the earnings their parents have taken from them." Jillian Benbow, *Under My Roof: Parents' Rights to Children's Earnings*, 16 J. Contemp. Legal Issues 71, 72 (2005); *see also Fox v. Schumann*, 158 N.W. 168, 169 (Mich. 1916).

The government's interpretation of 18 U.S.C. § 1589 would make a federal crime of the exercise of these innocuous, widely accepted parental rights. Take a hypothetical parent who requires his child to take out the garbage, make his bed, and mow the lawn. The child is quarrelsome and occasionally refuses to do his chores. In response, the child's parent sternly warns the child, and if the child still refuses, spanks him. The child then goes about doing his chores. There is no principled way to distinguish between that sort of hypothetical labor and what Toviave made the children do in this case. Both the tasks assigned to the child by the

hypothetical parent and the duties assigned by Toviave are "labor" in the economic sense of the word: one could, and people often do, pay employees to perform these types of domestic tasks.

But it has always been true that parents can make their children perform this kind of work. The forced labor statute could not have been intended to overturn this longstanding parental right. Indeed, the Supreme Court has long recognized that the Thirteenth Amendment "was not intended to apply to 'exceptional' cases well established in the common law at the time of the Thirteenth Amendment, such as 'the right of parents and guardians to the custody of their minor children or wards.'" *United States v. Kozminski*, 487 U.S. 931, 944 (1988) (quoting *Robertson v. Baldwin*, 165 U.S. 275, 282 (1897)). It is true that Toviave sometimes made the children babysit, and kept the money. But requiring one's child to babysit for a girlfriend is not beyond the bounds of what a guardian can reasonably expect from his child.

There are two ways, to be sure, in which Toviave's case is distinguishable from that of ordinary parents requiring chores. One is that Toviave is not actually the victims' parent or legal guardian, and the second is that the chores were enforced by reprehensible, abusive force. Neither distinction makes a difference, however, with respect to the federal crime of forced labor.

First, whether a person standing *in loco parentis* is an actual parent or legal guardian has little relevance one way or the other regarding forced labor. On the one hand a parent or guardian can commit forced labor, and is not immunized by that status. The forced labor statute contains no exception for parents or other close relatives, and at oral argument the Government said that parents can subject their children to forced labor under the statute. A forced-labor sweatshop could be run by a parent of one of the victims. For example, we have held that express parental acquiescence did not immunize cult leaders from liability under the analogous involuntary servitude statute. *See United States v. King*, 840 F.2d 1276, 1282 (6th Cir. 1988). On the other hand, one can easily think of a situation where a child is in the household of a thoughtful adult who temporarily brings that child into his or her home and takes responsibility for the child. Perhaps a grandmother has taken a child while the child's single parent is in rehabilitation, or away on military duty. The law necessarily recognizes that assigning household chores does not require parental or guardian status, where there is a cooperative,

homelike situation, even in far less sympathetic situations. *See e.g.*, *id.* at 1280. Thus the legality of parents' requiring their children to do chores does not depend on parental or guardian status. Indeed, so holding would undermine the ability to prosecute parents or guardians who commit forced labor of their children.

Second, the extremity of force is also not a determinant of forced labor, one way or the other. A parent who brutally beats a child to get the child to sit up straight or stop crying, or to punish a child for some slight misdeed is not guilty of forced labor. In that hypothetical, there may have been force, but there is no labor. On the other hand, paradigmatic forced labor, such as prostitution, forced sweatshop work, or forced domestic service, may be federally criminal even though the force is not physical at all, but merely psychological, such as isolation and pretended threats to the victim's friends or relations. *See* 18 U.S.C. § 1589(c)(2); *see also United States v. Sabhnani*, 599 F.3d 215, 226 (2d Cir. 2010). Thus the legality of parents' requiring their children to do chores does not depend on the presence of physical force. Indeed, so holding would undermine the ability to prosecute those who commit forced labor by psychological coercion.

One may ask what harm is done if child abuse without forced labor is deemed to be a federal crime. The harm is the federalization of state law. If it is the degree of force that turns what otherwise is not criminal forced labor into a federal crime, then it is the degree of force that is criminalized. In other words, the incidental presence of tasks turns the state crime of child abuse into a federal crime. "Congress has traditionally been reluctant to define as a federal crime conduct readily denounced as criminal by the States." *United States v. Bass*, 404 U.S. 336, 349 (1971). In recognition of that fact, the Supreme Court has shied away from reading criminal statutes as making "traditionally local criminal conduct . . . a matter for federal enforcement." *Jones v. United States*, 529 U.S. 848, 858 (2000) (quoting *Bass*, 404 U.S. at 350). In Michigan, an individual that "knowingly or intentionally causes physical harm to a child" is guilty of child abuse in the third degree. Mich. Comp. Laws § 750.136b(5)(a). In fact, child abuse is a crime in every other state as well. *See* NDAA, *Statutory Compilation: Physical Child Abuse Penalties* (April 2013) *available at* http://www.ndaa.org/pdf/Physical%20Child%20Abuse%20Penalties%20Compilation%202013%

20(3).pdf.   Indeed, in a case involving child abuse, albeit where the issue was abstention, the Supreme Court recognized that "[f]amily relations are a traditional area of state concern." *Moore v. Sims*, 442 U.S. 415, 435 (1979).  The Supreme Court has moreover "cautioned . . . that 'unless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance' in the prosecution of crimes."  *Jones*, 529 U.S. at 858 (quoting *Bass*, 404 U.S. at 349).  The forced labor law contains no sufficiently clear statement that it applies to the child abuse in this case.

The Supreme Court has recently reemphasized that we should be cautious in inferring Congressional intent to criminalize activity traditionally regulated by the states.  *Bond v. United States*, 134 S. Ct. 2077 (2014), involved "an amateur attempt by a jilted wife to injure her husband's lover, which ended up causing only a minor thumb burn readily treated by rinsing with water."  *Id.* at 2083.  The wife, a microbiologist, obtained two different chemicals that can be lethal in high enough doses.  *Id.* at 2085.  She proceeded to spread the chemicals on the lover's "car door, mailbox, and door knob."  *Id.*  Because the chemicals were easy to see, the lover managed to avoid serious harm.  *Id.*  Eventually, postal service investigators caught the wife.  *Id.*  Despite the unwarlike nature of the wife's conduct, the government charged her with two counts of possessing chemical weapons in violation of 18 U.S.C. § 229.

The government's position was that the wife's conduct fell within the very broad scope of the chemical weapon statute.  Section 229F defines a chemical weapon as any "toxic chemical" except for those intended for "[a]ny peaceful purpose related to an industrial, agricultural, research, medical, or pharmaceutical activity or other activity."  *Id*. § 229F(7).  Clearly the wife's purpose was not peaceful; it was to harm (or at least aggravate) the lover.  *Bond*, 134 S. Ct. at 2088.  But could a statute with origins arising out of the trench warfare of World War I really apply to conduct that amounted to a vindictive prank?  Not according to the Supreme Court.  The Court reasoned that § 229 was ambiguous due in part to the "improbably broad reach of" the definition of chemical weapon and the "deeply serious consequences of adopting such a boundless reading."  *Id.* at 2090.  The Court held that reliance on the principles discussed above—insisting that Congress clearly indicate that it intends to criminalize "purely local crimes"—was appropriate in light of the ambiguity.  *Id.*  While the federal government might

have "a substantial interest in enforcing criminal laws against assassination, terrorism, and acts with the potential to cause mass suffering," Congress does not typically criminalize purely local conduct like the wife's garden-variety assault. *Id.* at 2092.

The reasoning of the Supreme Court appears to apply directly to Toviave's case. The Court explained that "[p]art of a fair reading of statutory text is recognizing that 'Congress legislates against the backdrop' of certain unexpressed presumptions." *Id.* at 2088 (quoting *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991)). One unexpressed assumption, surely as incontrovertible as the examples used by the Supreme Court, is that parents can require their children to do household chores. In the words of the Supreme Court, "[t]he notion that some things 'go without saying' applies to legislation just as it does to everyday life." *Id.* The Supreme Court relied in particular on the background principle of construction that "'it is incumbent upon the federal courts to be certain of Congress' intent before finding that federal law overrides' the 'usual constitutional balance of federal and state powers.'" *Id.* at 2089 (quoting *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991)). The Court explained that it has "applied this background principle when construing federal statutes that touched on several areas of traditional state responsibility," and "[p]erhaps the clearest example of traditional state authority is the punishment of local criminal activity." *Id.* As explained above, household child abuse is quintessential local criminal activity, at least as much as the arson in *Jones*, 529 U.S. 848, relied upon by the Court. The Court proceeded to reason that "[i]n settling on a fair reading of a statute, it is not unusual to consider the ordinary meaning of a defined term, particularly when there is dissonance between that ordinary meaning and the reach of the definition."

The Court continued:

> The Government would have us brush aside the ordinary meaning and adopt a reading of section 229 that would sweep in everything from the detergent under the kitchen sink to the stain remover in the laundry room. Yet no one would ordinarily describe those substances as "chemical weapons." The Government responds that because Bond used "specialized, highly toxic" (though legal) chemicals, "this case presents no occasion to address whether Congress intended [section 229] to apply to common household substances." That the statute *would* apply so broadly, however, is the inescapable conclusion of the Government's position: Any parent would be guilty of a serious federal offense—possession of a chemical weapon—when, exasperated by the children's repeated failure to clean the goldfish tank, he considers poisoning the fish with a few drops of vinegar.

> We are reluctant to ignore the ordinary meaning of "chemical weapon" when doing so would transform a statute passed to implement the international Convention on Chemical Weapons into one that also makes it a federal offense to poison goldfish. That would not be a "realistic assessment[ ] of congressional intent."

*Bond*, 134 S. Ct. at 2091 (internal citations omitted). Similarly, we should not—without a clear expression of Congressional intent—transform a statute passed to implement the Thirteenth Amendment against slavery or involuntary servitude into one that generally makes it a crime for a person *in loco parentis* to require household chores, or makes child abuse a federal crime.

None of this undermines the reasoning of the forced labor decisions of this court and our sister circuits. For example, Toviave's treatment of the children contrasts with the defendants' treatment of the victim in *United States v. Nnaji*, 447 F. App'x 558 (5th Cir. 2011). There, the victim "woke at 4:00 a.m. every day, attended to all of the household chores, and was the sole caregiver for the Nnajis' children. . . . Over the more than eight years that the victim spent working for the Nnajis, she was not paid, and her family in Nigeria received less than $400 from the Nnajis." *Id.* at 559. The defendants falsely told the victim that her salary would be deposited in a bank account and that money was being sent to the victim's children in Nigeria. Defendants kept the victim isolated, prohibiting her from making contact with outsiders, deciding not to teach her how to use the telephone other than for emergency situations, and accompanying her whenever she left the house. These factors described by the Fifth Circuit in *Nnaji* contrast sharply with the facts of the instant case.

Other cases in which forced labor has been found in the household context are also distinguishable in crucial ways. Most involve defendants that subjected their victims to more extreme isolation, and none of the defendants provided their victims with an education. The Seventh Circuit's *Calimlim* decision involved a family that brought a Filipino woman—with no apparent relationship to the defendant—to the United States to work as a domestic servant. 538 F.3d 706, 708 (7th Cir. 2008). The family confiscated the woman's travel documents and used her immigration status and her family's reliance on her meager wages to keep the woman isolated from the outside world. *Id.* at 709. The woman left the Philippines to work as a domestic servant, and the family's conduct was clearly aimed at keeping her from leaving or asking for more money. The defendant in *United States v. Dann*, 652 F.3d 1160 (9th Cir. 2011),

met the victim in Peru, asked her to come work for her as a nanny, confiscated her passport, refused to pay her, and kept her presence in the United States a secret. *Id.* at 1162. Again, the evidence indicated that the defendant went to great lengths to keep the victim hidden so that she could benefit from the woman's labor. In *United States v. Afolabi*, 508 F. App'x 111, 113 (3d Cir. 2013), the defendant—a Togolese woman—brought more than twenty young girls to the United States to work in hair-braiding salons. In evaluating the sufficiency of the evidence, the Third Circuit summarized the relevant facts:

> Five victims testified at trial that despite promises of schooling upon arrival in the United States, they were forced to work 60 to 100 hours per week for several years and to hand over all earnings from the hair-braiding salons where they worked. They testified that they did so because Afolabi and her co-conspirators (1) separated them from their families, any school community, funds, or identifying documents; (2) threatened to deport them to Africa and to beat them violently; and (3) in fact did assault and beat them, with various implements.

*Id*. at 119. Our own decision in *United States v. Djoumessi*, 538 F.3d 547 (6th Cir. 2008), which involved a prosecution under the involuntary servitude statute, was about a family that brought a fourteen-year-old Cameroonian girl to Detroit to work as a domestic servant. *Id.* at 549. The victim worked sixteen hours a day, did all of the housework, and provided all of the childcare for the defendants. *Id.* The defendants never paid the victim, allowed her to leave the home only as part of her childcare duties, beat her, and even sexually abused her on three occasions. *Id.*

All of these cases involved victims who were brought to the United States to work and who were subsequently cheated out of the salaries they were promised all while being subjected to intolerable living conditions. *See also United States v. Sabhnani*, 599 F.3d 215 (2d Cir. 2010). Here, the children were brought to the United States to obtain an education. The parties appear to agree that the children spent a substantial amount of time at school, doing homework, and studying. In fact, the evidence shows that Toviave had an almost single-minded fixation on making sure the children got an education. Defendants in other cases typically exploit their victims' lack of education and familiarity with English as a way to keep them isolated from the outside world. Here, Toviave actually hired an English tutor for the children when they first arrived. It is hard to imagine why Toviave would bother to teach the children English if the point of the relationship was exploitation.

Furthermore, the victims in the other cases were denied almost all contact with the outside world.  The evidence in this case shows that the children attended school, spent time with relatives and Toviave's friends, engaged in recreational activities, and went on vacations with Toviave.  The children also interacted with teachers, classmates, and teammates on sports teams. Viewing the evidence favorably to the government, it is true that the children probably did not have the same freedom as many other children.  For example, Toviave did not let the children have friends over, go to sleep-overs, or freely use the phone.  But their isolation was not nearly as severe as the victims in other forced labor cases.  Finally, we have found no other cases where the government convicted a victim's relative of forced labor.  This absence is likely explained by the difficulty of drawing a line between what amounts to forced labor and what are widely accepted childrearing practices in the context of a familial relationship where the labor at issue consists entirely of household chores.

The line between required chores and forced labor may be a fine one in some circumstances, but that cannot mean that all household chores are forced labor, with only the discretion of prosecutors protecting thoughtful parents from federal prosecution.  The facts of this case fall on the chores side of the line.

Because the Government did not present sufficient evidence of forced labor, we need not reach the other issues in this case.  Toviave's convictions for forced labor are REVERSED.