**Affirm and Opinion Filed April 28, 2023**



**In the**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-22-00219-CR**

**JEFFERY LEON BARRETT, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 354th Judicial District Court**
**Hunt County, Texas**
**Trial Court Cause No. 32470CR**

## MEMORANDUM OPINION

Before Justices Molberg, Carlyle, and Smith
Opinion by Justice Carlyle

A jury convicted appellant Jeffery Leon Barrett[1] of continuous trafficking of persons and sentenced him to life imprisonment and a $10,000.00 fine. He contends (1) the trafficking of persons statute is unconstitutional as applied to him, (2) the evidence is insufficient to support his conviction under that statute, and (3) the trial court erred by denying his requested jury instruction regarding "the law on labor trafficking" in the Texas Administrative Code. We affirm.

---

[1] Though the indictment and numerous other documents in the record show Mr. Barrett's first name as "Jeffery," his appellate brief and other portions of the record use the spellings "Jeffry" and "Jeffrey." During pretrial proceedings, Mr. Barrett stated the spelling on the indictment is correct.

**Background**

The indictment in this case alleged that on two or more occasions from about February 11, 2012, to September 23, 2017, Mr. Barrett engaged in conduct that constituted an offense under Texas Penal Code section 20A.02, titled "Trafficking of Persons." Specifically, the indictment charged he (1) "knowingly traffic[ked]" three of his children under eighteen years old and "through force, fraud, or coercion" caused them "to engage in forced labor or services" and (2) "knowingly receive[d] a benefit from participating in a venture that involved trafficking [those children] and through force, fraud or coercion caused [those children] to engage in forced labor or services."

Mr. Barrett's wife, Barbara Barrett, was indicted simultaneously on identical charges in a separate case and represented by separate counsel. The trial court jointly heard and denied the couple's identical (1) pretrial motions to quash the indictments because it is "legally impossible for a parent to submit their own child to forced labor or service," (2) pretrial applications for writ of habeas corpus based on "the exact same argument" as the motions to quash, and (3) additional pretrial applications for writ of habeas corpus asserting facial constitutional challenges to penal code subsections 20A.02(a)(5) and 20A.02(a)(6). The Barretts appealed the trial court's rulings on the facial constitutional challenges and this Court affirmed. *See Ex parte*

*Barrett*, 608 S.W.3d 80, 97 (Tex. App.—Dallas 2020, pet. ref'd). Then, the Barretts' cases were tried separately.[2]

At trial, T.B.1 testified he was born in 2000 and was adopted by the Barretts when he was about four years old. The Barrett family moved to Texas when T.B.1 was about nine or ten. At that time, the Barretts also had four younger adopted children: daughters T.B.2 and A.B. and sons T.B.3 and J.B.[3]

In 2012, the Barretts and their five children lived in a house on a country road in Greenville, Texas. They had two or three dogs. T.B.1 and T.B.2 attended public school. T.B.1 testified he never saw the Barretts work outside the home in Texas and did not "have any reason to think they did." He stated the Barretts got "checks in the mail" that "had all of the kids' names on them" and "made plans based on those checks coming in every month."

T.B.1 testified that during fifth grade, he was called to the school's office and "there was a CPS case worker in there asking, you know, how is home life."[4] The Barretts removed him and his siblings from school before the end of that school year. T.B.1 and T.B.2 "did home schooling" online for a few months until Ms. Barrett

---

[2] Ms. Barrett was also convicted by a jury and appealed to this Court in cause number 05-21-00912-CR. This Court's opinions in both cases are being issued simultaneously.

[3] Additionally, the Barretts have two older biological children, who were not living with them at the time of these events. T.B.3, J.B., and the Barretts' biological children are not involved in this case.

[4] The record shows the term "CPS" refers to the Texas Department of Family and Protective Services.

stopped paying for the online program. None of the children received any formal schooling after that.

About a month later, "some other dogs came" and a "structure" was built onto the garage comprising a kennel with cages. According to T.B.1, after the structure was finished, "more and more" dogs arrived. The Barretts obtained a license and began "breeding them for money." There were sometimes more than 100 dogs on the property, mostly yorkies, poodles, and cavaliers.

After the children were withdrawn from school, they were not allowed off the property without Mr. Barrett or Ms. Barrett. Though they sometimes had access to a computer, the children could not see friends and did not receive an allowance. T.B.1 and his sisters were required to perform unpaid work pertaining to the Barretts' dog-selling business, which T.B.1 testified consumed "90 percent" of his time.

T.B.1 stated the kennel was an uninsulated metal and plywood structure that was "real hot in the summer." It was "mainly dark" inside and smelled "horrible" inside and outside. The noise was terrible because the dogs' barking "echoed off the building." To talk with someone inside the building, "you would have to be screaming." There also "was a bunch of dogs in the house" that were uncaged.

Seven days a week, Mr. Barrett would awaken T.B.1 by shaking him and tell him to go feed the dogs and quiet them. T.B.1 had to use a 5-gallon bucket to bring water from a bathtub in the house to the kennel. Watering the dogs took about fifteen trips. T.B.1 and his sisters had to clean the dogs' cages without gloves or coverings

for their clothing and got dog feces on them "pretty often." The work each morning took about five to six hours. In the evening, the three children fed and watered the dogs again. Additionally, the children were required to administer the dogs' vaccine injections, keep vaccine records, and photograph the dogs for the business's website. If the Texas Department of Licensing and Regulation was coming for an inspection, the children had to groom the dogs and do additional cleaning so "the license could get renewed." On those occasions, the three children worked "morning to night" until after dark.

T.B.1 stated that though he and his sisters were "out there every day" cleaning the kennel building, it was not always clean because "you can only do so much with a broom with that many dogs or, you know, people." Though Ms. Barrett rarely entered the kennel building, Mr. Barrett went in "maybe every week or so," sometimes at Ms. Barrett's direction. According to T.B.1, Mr. Barrett was the "muscle" and did what Ms. Barrett wanted done. If Ms. Barrett "found out" the structure was not clean, she would "start screaming" and T.B.1 and his sisters would "get hit because of that." Usually, Mr. Barrett "did the hitting." T.B.1 testified Mr. Barrett never said to Ms. Barrett that "the beatings should stop" or that the children "shouldn't get hit."

T.B.1 also testified "physical abuse happen[ed]" when "somebody wasn't doing something they were supposed to," including "someone not working in the kennel" or "someone talking back about going to work in the kennel." Mr. Barrett

–5–

"was the one carrying out the punishment" about ninety percent of the time. The item used most often to hit the children was a "stick" consisting of "a two-by-four that was, like, shaved down at the handle." Pieces of that stick were admitted into evidence without objection. The children were hit all over their bodies with the stick, including on their heads, which left "a bump." Other items used to hit the children included "bamboo stick things" and a "brush." T.B.1 stated he and his sisters received beatings by Mr. Barrett "related to the kennel" from 2012 to 2017. The beatings sometimes left bruises that lasted "a while." Additionally, the couple told the children "a lot" that they were "retarded," "worthless," and "good for nothing."

T.B.1 stated the children's work included caring for the dogs that lived in the house. Mr. and Ms. Barrett's bedroom was the "most chaotic" room because about eleven dogs were kept there and were never let outside. The flooring in that bedroom was "encrusted" with dog feces and urine because the dogs "went on the floor" and "it wasn't cleaned." T.B.1 testified that as punishment, one of the girls had to sleep on the floor of that room without a blanket or pillow.

The dogs were sold online and also were taken to public places for sale, including flea markets and Walmart parking lots. T.B.1 went to a Walmart with the Barretts once and saw a sale made in cash. He also went to Sam's Club with them several times to purchase food and kennel supplies and "help[ed] unload some of that stuff."

T.B.1 stated that one night in 2017, T.B.2 said something to Ms. Barrett, who responded by "yelling and throwing shit." T.B.2 ran outside. The Barretts and T.B.1 went looking for her but could not find her. The next day, the Barretts picked up T.B.2 from the police station and brought her back to the house. That same day, CPS came to the house and interviewed all of them. CPS removed the children from the Barrett home a short time later.

Wendy Lopez testified that on September 23, 2017, she finished working her shift at a Greenville restaurant at about 1 a.m. and went "driving around" with a friend. They saw a young girl walking on a service road near a gas station. Ms. Lopez was concerned about the girl's safety, so she stopped and asked the girl if she needed a ride somewhere. The girl, T.B.2, appeared scared but eventually got into Ms. Lopez's car. She smelled of animal feces and urine and "refused to go home." Ms. Lopez and her friend realized she was a minor and called police, who came and picked her up.

Greenville police officer Joshua Robinson testified that at the police station that night, T.B.2 "made an outcry of assault." She had bruises on both arms, which he photographed. Several hours later, Officer Robinson was dispatched to the Barretts' home to assist CPS with their follow-up investigation. He told Ms. Barrett CPS had possession of T.B.2 and wanted to speak with the other children. The other children seemed "nervous" and "didn't have real, true answers to anything CPS was

asking." Though CPS did not remove the children at that time, the case was referred for further law enforcement investigation.

T.B.2 testified she was born in 2001 and was adopted by the Barretts when she was six. At the time the children were withdrawn from school in 2012, her assigned chores included cleaning the common areas of the house, doing the dishes, and sometimes doing laundry. After the kennel was built, she had additional chores pertaining to the dogs. She mainly cared for "the puppies," which typically numbered about thirty or forty. Some were kept in the house. She fed and watered them and cleaned their cages. She also sometimes fed and watered the older dogs in the kennel when told to do so. Additionally, she groomed the dogs when Ms. Barrett directed. T.B.2 stated "[a] lot of the dogs were, like, matted and nasty" and "covered in, like, their own feces," so they would be groomed "when we had a sale." Sometimes her work would take "the whole day." Mr. and Ms. Barrett did not perform work with the children and "rarely" cleaned up after the dogs. T.B.2 did not have a phone at any time while she lived with the Barretts.

T.B.2 testified Ms. Barrett had an SUV and Mr. Barrett had "a pretty pricey truck." When Mr. and Ms. Barrett went to Sam's Club or Costco to buy dog food and cleaning supplies, T.B.2 usually went with them. T.B.2 stated she was able to lift and carry the fifty-pound bags of dog food they bought. She also went to Walmart with Ms. Barrett many times to sell puppies and "[w]e would all hold dogs while we were there if the cages were full." She saw many dogs sold on the Walmart trips.

T.B.2 stated that if she, T.B.1, and A.B. didn't do their chores pertaining to the dogs, they were beaten with "two-by-fours," sticks, electrical cords, or other "random stuff." Mr. Barrett usually did the hitting. T.B.2 stated the beatings happened "all the time" and "I've had a two-by-four broken over me." She testified she tried to be obedient because she "didn't want to get beat all the time." She stated Mr. Barrett was also verbally abusive to her and "would speak a lot about, like, how I would be like my mother, like a prostitute."

In September 2017, T.B.2 decided she had "had enough." She went outside late one night and "started running." She wanted to "get away" and was hoping maybe somebody would help her. She ran to a gas station, where two young women picked her up and took her to Whataburger. The young women asked her about the bruises on her arms and then called police. T.B.2 was relieved but was also scared because Ms. Barrett had told the children that if they "told CPS" they would be put in placements where they would be raped or harmed. She stated the police photographed bruises on her arms and legs. Those photographs were admitted into evidence without objection and published to the jury.

T.B.2 was returned to the Barrett household the following day, which surprised and angered her. The house was much cleaner than usual and Ms. Barrett had told the other children not to talk to her. The next day, CPS visited. T.B.2 showed CPS the sticks used to beat the children and gave one of the sticks to an

–9–

accompanying police officer. At that point, CPS removed the children from the home.

Additionally, the Society for the Prevention of Cruelty to Animals seized and removed the 115 dogs on the property "for animal cruelty." An SPCA officer who visited the property before the dogs were removed testified the cages were overcrowded and inadequately ventilated, the dogs' fur was matted with feces and urine, and she did not see sufficient equipment to care for the animals. She stated it was "unreasonable" to expect three children of the complainants' ages to be able care for that many dogs.

A.B. testified she was born in 2003. After the children were withdrawn from school in 2012, her jobs regarding the dogs were feeding, cleaning, and grooming them and helping the female dogs give birth. When a pregnant dog went into labor, A.B. would sit with her the entire time and "help her with the puppies as she was pushing them out," then cut the umbilical cords, clear mucus from the puppies' lungs, and help the mother dog "finish up." Then, she had to clean all the supplies for the next time. T.B.1 trained her in those tasks because he had that job before her. She had "no choices" regarding her work with the dogs.

When A.B., T.B.1, and T.B.2 got up each morning, they had to feed and water the dogs and clean the cages before eating breakfast or they would "get in trouble." Mr. Barrett would sometimes check whether their work had been done. If the children "ran their mouths" about not wanting to take care of the dogs or about

"telling on" the Barretts, they would get hit with "sticks," a strap, and other items. Mr. Barrett hit A.B. with sticks on many occasions. He hit her "[a]nywhere, everywhere," including her back, legs, head, and arms, and she "basically just felt like I was somebody's, like, human punching bag." Ms. Barrett also hit her with sticks many times and withheld food as a punishment. Both Barretts pulled her hair and called her names on multiple occasions. Sometimes the Barretts made her sleep on the floor of their bedroom without a pillow or blanket. The bedroom floor was "[d]irty with, like, feces" and multiple dogs were in there "going to the bathroom" around her.

A.B. stated she was present for the selling of dogs many times. The sales were usually prearranged online and the dogs were then taken to meeting places. She and T.B.2 often went to the meeting places, depending on "how many hands were needed." Mr. Barrett was usually the driver. The sales were generally made in cash. The children did not receive any money or reward.

A.B. testified that on one occasion Ms. Barrett told her that because her attitude was "disrespectful," she was being sent to another kennel to work for someone else as "a punishment." Ms. Barrett drove her to the other kennel. During the time A.B. worked at that kennel, she didn't tell anybody there what was happening at the Barretts' house because she was scared.

A.B. stated that the day after T.B.2 ran away, they did a "full house clean." Ms. Barrett told the children to tell CPS that T.B.2 "was crazy." When T.B.2 returned

the next day, she and A.B. "made a plan" to "tell people what's going on," including that they weren't going to school and the Barretts were abusing them. When a woman from CPS came to A.B.'s room to interview her, A.B. showed her one of the sticks the Barretts used to hit her. A.B. testified "she walked me out, and then that was the last time I ever went back to that house." CPS took photographs of multiple bruises on A.B.'s arms and legs. The photographs were admitted into evidence without objection and published to the jury.

Conrad Rodriguez, a special agent with the Texas Department of Public Safety's human trafficking and child exploitation unit, testified he investigated this case after the children were removed from the Barretts' home. He searched the house for evidence corroborating the children's statements. The house smelled strongly of dog urine and feces. He saw nothing "geared toward a child's learning or development." His investigation showed a "dog kennel operation" was being run from the house and he found records pertaining to dogs being sold. Based on his investigation, Mr. Barrett was arrested for continuous human trafficking.

On cross-examination, Agent Rodriguez stated parents have the right to homeschool their children and can "force [them] to do household chores" and "have them work in a family business." He also stated that prior to this case he had never "seen a case involving alleged human trafficking for forced labor involving parents and children."

Dr. Vanessa Bouche testified she conducts research and provides consulting services regarding human trafficking. She stated (1) she has "seen situations where the victim was related to the trafficker," (2) "it's in a trafficker's interest to keep that victim as isolated as possible" and purposely keep the victim uneducated, (3) there are situations in which a trafficker might take a victim out in public as "a means of deterring other people from being suspicious" or a "means of control," and (4) traffickers often engage in the trafficking "under the guise of helping the victim."

On cross-examination, Dr. Bouche stated she cannot recall "another instance where parents are alleged to have human trafficked their children" with regard to labor trafficking rather than sex trafficking. She also stated parents "have the legal right and duty to discipline their children" and can use fraud, psychological manipulation, and "spanking" to get their children to do domestic chores.

After the State rested its case, Mr. Barrett moved for a directed verdict outside the jury's presence. He contended the State had "not provided sufficient evidence to show that [T.B.1, T.B.2, and A.B.] engaged in forced labor or services" and had "not provided sufficient evidence . . . to show that [he] knowingly received a benefit from participating in a venture that involved the . . . three complainants to engage in forced labor or services." The trial court denied the directed verdict motion.

Several members of Mr. Barrett's extended family testified that during the years in question they visited the Barrett house a few times and attended some holiday gatherings with the Barrett family. They stated that though the house looked

and smelled "pretty bad," they never saw Mr. Barrett "be mean to any of those kids" and the children did not "seem afraid" of him. Mr. Barrett's sister testified "it was never an ideal household" and "was very tense, very uncomfortable." She stated that during the last few years before the children were removed, "there wasn't really a lot of visiting going on" and it seemed like the couple and their children "were more to themselves" and "more isolated."

During the charge conference, Mr. Barrett's counsel requested that the charge quote "Administrative Code 704.59(B)," which defense counsel asserted "states that labor trafficking does not include normal contributions to the family and community life in light of prevailing community standards." The trial court denied that request.

In closing, defense counsel argued, among other things:

> Forced labor or services and children. When you consider that that definition is being used to apply to a person's children, that should scare everyone of you. It scares me. I mean, can you not force your children to—and force labor or services without being prosecuted for trafficking? And I'm not talking about—if there are injuries related to that forced labor or services, that's injury to a child but it's not trafficking because it's the parent, because it's the parent.
>
> . . . [P]arents have the right to force their children to work. Do they have the right to hurt them and abuse them? Of course not. Of course not. And that's injury to a child.
> . . . .
> . . . I'm not asking you not to have sympathy or empathy for these children. The children were removed ultimately. So bad things happen, but I'm asking you to just follow the law and the constitution and protect all of our rights; Jeffery's rights, our rights, the right to parent our children as we see fit without being prosecuted for an offense that just doesn't fit. It's like the State is trying to make an apple pie out of oranges. It just doesn't work that way.

The jury charge instructed, among things, that "[t]he use of force, but not deadly force, against a child younger than 18 years is justified: if the actor is the child's parent and when and to the degree the actor reasonably believes the force is necessary to discipline the child or to safeguard or promote his welfare." Following the jury's deliberations, the trial court entered a judgment consistent with the jury's above-described verdicts.

**Analysis**

Penal code section 20A.02(a)(5)–(6) provides, among other things, that a person commits the offense of "trafficking of persons" if he knowingly:

> (5) traffics a child with the intent that the trafficked child engage in forced labor or services [or]
>
> (6) receives a benefit from participating in a venture that involves an activity described by Subdivision (5), including by receiving labor or services the person knows are forced labor or services[.]

An offense under those subsections is a first-degree felony. TEX. PENAL CODE § 20A.02(b)(1). If conduct constituting an offense under section 20A.02 also constitutes an offense under another section of the penal code, "the actor may be prosecuted under either section or under both sections." *Id.* § 20A.02(c).

A person commits the offense of "continuous trafficking of persons" if, during a period that is thirty or more days in duration, the person engages two or more times in conduct that constitutes an offense under section 20A.02 against one or more victims. *Id.* § 20A.03(a). That offense is a first-degree felony "punishable by

imprisonment in the Texas Department of Criminal Justice for life or for any term of not more than 99 years or less than 25 years." *Id*. § 20A.03(e).

"Traffic" means "to transport, entice, recruit, harbor, provide, or otherwise obtain another person by any means." *Id*. § 20A.01(4). "Forced labor or services" means "labor or services, other than labor or services that constitute sexual conduct, that are performed or provided by another person and obtained through an actor's use of force, fraud, or coercion." *Id*. § 20A.01(2). "Child" means "a person younger than 18 years of age." *Id*. § 20A.01(1).

The use of force, but not deadly force, against a child younger than eighteen years is justified if the actor is the child's parent and "when and to the degree the actor reasonably believes the force is necessary to discipline the child or to safeguard or promote his welfare." *Id*. § 9.61(a).

### As-applied constitutional challenge

To preserve error for appellate review, an appellant ordinarily must make a timely request, objection, or motion to the trial court stating the grounds for the ruling sought "with sufficient specificity to alert the trial court to the complaint" and obtain a ruling by the trial court. TEX. R. APP. P. 33.1(a); *see Flores v. State*, 245 S.W.3d 432, 437 n.14 (Tex. Crim. App. 2008) (an appellant "must preserve an 'as applied' constitutional challenge by raising it at trial"). "[A] general or imprecise objection will not preserve error for appeal unless 'the legal basis for the objection

–16–

is obvious to the court and to opposing counsel.'" *Vasquez v. State*, 483 S.W.3d 550, 554 (Tex. Crim. App. 2016).

In his first issue, Mr. Barrett contends penal code subsections 20A.02(a)(5) and 20A.02(a)(6), the predicate offenses for the continuous trafficking charges in this case, are unconstitutional as applied to him because they violate his federal and state constitutional rights of due process and due course. Specifically, he asserts the application of the terms "traffic" and "forced labor and services" are "contrary to the fundamental rights and duties Appellant has as a parent."

The State contends Mr. Barrett forfeited this argument by failing to raise it in the trial court. We agree.

Mr. Barrett argues he adequately preserved his as-applied challenge because he "made his pretrial complaint known to the trial court and continued arguing throughout the case that the prosecution was not a proper use of the trafficking/forced labor statute." The record shows Mr. Barrett's pretrial motion to quash the indictment and his first application for writ of habeas corpus asserted that "being the parent of the alleged victim" is a legal defense and bar to prosecution for trafficking of persons to engage in forced labor or services, "as parents are in the unique position of having the legal authority to force their children to work" and "have the right to all of the earnings or profits from the services of their children."

The second application for writ of habeas corpus stated "[t]he challenged grounds relate to defects apparent on the face of the statute upon which the

–17–

indictment is based." During the joint pretrial hearing on that application, defense counsel stated, "There's a facial attack and there's an as-applied attack, and this writ is a facial attack. An applied attack will come, should the Court not grant this, at the end of trial once all the facts are in."

After the State rested, Mr. Barrett moved for a directed verdict based on insufficient evidence of the offense's elements. During closing argument, defense counsel told the jury, "I'm asking you to just follow the law and the constitution and protect all of our rights; Jeffery's rights, our rights, the right to parent our children as we see fit without being prosecuted for an offense that just doesn't fit."

"Since [a contention that a statute is unconstitutional as applied] requires a recourse to evidence, it cannot be properly raised by a pretrial motion to quash the charging instrument." *State ex rel. Lykos v. Fine*, 330 S.W.3d 904, 910 (Tex. Crim. App. 2011) (cleaned up). Thus, the pretrial motion to quash did not preserve the error in question.

During the hearing on the second pretrial application for writ of habeas corpus, defense counsel stated that Mr. Barrett was not asserting an as-applied constitutional challenge at that time. At conclusion of the State's case, Mr. Barrett asserted only evidentiary insufficiency. At closing, he argued that the charged offense "just doesn't fit." Nothing in the record shows Mr. Barrett asserted a timely as-applied constitutional challenge "obvious to the court and to opposing counsel" and obtained a ruling on that complaint. *See Vasquez*, 483 S.W.3d at 554; TEX. R.

APP. P. 33.1(a). Thus, we conclude Mr. Barrett's as-applied constitutional challenge presents nothing for this Court's review. TEX. R. APP. P. 33.1(a); *see Burton v. State*, 194 S.W.3d 686, 688 (Tex. App.—Houston [14th Dist.] 2006, no pet.) (concluding appellant's as-applied constitutional challenge was not preserved where he urged the jury to consider his religious beliefs in determining his guilt but "fail[ed] to request that the trial court find the statute unconstitutional as applied to him"); *see also Barnes v. State*, 631 S.W.3d 281, 284 (Tex. App.—Houston [14th Dist.] 2020, pet. ref'd) (rejecting appellant's position that his appellate issue asserting an as-applied constitutional challenge was "part of his legal sufficiency challenge and he was not required to preserve error").

### *Evidentiary sufficiency*

In assessing the sufficiency of the evidence, we consider all the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational factfinder could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Alfaro-Jimenez v. State*, 577 S.W.3d 240, 243–44 (Tex. Crim. App. 2019). This standard requires that we defer "to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Zuniga v. State*, 551 S.W.3d 729, 732 (Tex. Crim. App. 2018).

The construction of a statute is a question of law that we review de novo. *See, e.g., Herron v. State*, 625 S.W.3d 144, 152–53 (Tex. Crim. App. 2021). Courts must construe a statute in accordance with the plain meaning of its text unless the language of the statute is ambiguous or the literal text leads to "absurd consequences that the Legislature could not *possibly* have intended." *Boykin v. State*, 818 S.W.2d 782, 785 (Tex. Crim. App. 1991). "In ascertaining the plain meaning of a word, we read words and phrases in context and construe them according to the rules of grammar and usage." *Lopez v. State*, 253 S.W.3d 680, 685 (Tex. Crim. App. 2008). Where a statute is clear and unambiguous, the legislature must be understood to mean what it has expressed, and it is not for the courts to add or subtract from the statute. *Boykin*, 818 S.W.2d at 785.

In his second issue, Mr. Barrett contends the evidence is insufficient to prove he is guilty of continuous trafficking of humans because the State "presented no evidence or only a scintilla of evidence on the elements of scienter, trafficking, forced labor or services, and receipt of a benefit" as required by subsections 20A.02(5) and 20A.02(6). We address these challenged elements in turn.

With regard to "trafficking," Mr. Barrett argues (1) though the term "transport" has been construed by the Texas Court of Criminal Appeals "to include the act of driving," that plain meaning produces "an absurd result" in this case; (2) the State's argument at trial that he "beat and abused" the children "is not consistent with the plain meaning of the word 'harbor'"; and (3) "[t]he Legislature

–20–

placed the phrase 'or otherwise obtain' in the statute to modify all of the other words in the series before it" and "there is no evidence that Appellant transported or harbored the children in order to obtain them."

"[W]ords not specifically defined by the Legislature are to be understood as ordinary usage allows, and jurors may thus freely read statutory language to have any meaning which is acceptable in common parlance." *Vernon v. State*, 841 S.W.2d 407, 409 (Tex. Crim. App. 1992). Our sister court of appeals in Austin concluded in two section 20A.03 cases involving sexual conduct with minors that "a rational jury could have determined that [the defendant] transported [the complainant]" pursuant to section 20A.01(4) by "driving her to different locations" where he engaged in sexual conduct with her. *Griffin v. State*, No. 03-19-00429-CR, 2020 WL 7640149, at *5 (Tex. App.—Austin Dec. 23, 2020, pet. ref'd) (mem. op., not designated for publication); *Ritz v. State*, 481 S.W.3d 383, 386 (Tex. App.—Austin 2015, pet. dism'd). Though the most commonly recognized meanings of the verb "harbor" are "to give shelter to" and "to give refuge to," *see Urbanski v. State*, 993 S.W.2d 789, 793 (Tex. App.—Dallas 1999, no pet.), the word's definitions also include to "conceal or hide." *See Harbor*, WEBSTER'S NEW WORLD COLLEGE DICTIONARY (4th ed. 2001). We consider these definitions in addressing Mr. Barrett's arguments. *See Vernon*, 841 S.W.2d at 409.

Section 20A.01(4) does not use the words "in order to obtain" and we decline to add that language. *See Boykin*, 818 S.W.2d at 785. Regardless, the record shows

Mr. Barrett drove the children to different locations to obtain their labor in handling kennel supplies and selling dogs in those locations. The record also supports a reasonable inference that the Barretts isolated the children to, at least in part, conceal the children's forced labor in the dog-selling business. Thus, we conclude the record contains more than a scintilla of evidence that Mr. Barrett "trafficked" the three complainants pursuant to section 20A.01(4).

As to the terms scienter, forced labor or services, and receipt of a benefit, Mr. Barrett contends there is no evidence he "unlawfully forced labor or services upon his children within the meaning of the statute." He asserts the evidence shows he (1) "forced them to work in the family business which he had every right to do"; (2) "received a benefit from the family business in which they all worked, which he had every right to do"; and (3) "disciplined the children when they disobeyed him and his wife." His arguments do not really challenge the sufficiency of the evidence, but instead challenge the application of the statute to the facts of this case based on his alleged fundamental rights. In other words, Mr. Barrett improperly conflates evidentiary sufficiency and his forfeited as-applied constitutionality challenge. We properly limit our analysis to the evidentiary sufficiency complaint before us. *See Ritz v. State*, 533 S.W.3d 302, 309 (Tex. Crim. App. 2017) (per curiam) (Newell, J., concurring) (noting that court of appeals properly declined to address a "challenge to the sufficiency of the evidence [that] is not really a challenge to the evidence" and limited its analysis to "the legal sufficiency claim before it").

The record shows the children testified they had no choice whether to work in the Barretts' dog-selling business and were forced to do so. Mr. Barrett does not dispute that he intended that the children engage in forced labor or services. Additionally, the record shows he received a benefit from that activity because he received money from selling the dogs, which he knew were raised, cared for, and sold through forced labor or services. Thus, we conclude the record contains more than a scintilla of evidence supporting the elements of scienter, forced labor or services, and receipt of a benefit.

Mr. Barrett contends interpreting the trafficking statute in accordance with its plain meaning here produces an absurd result because the legislature could not possibly have intended that he "could lawfully be convicted of trafficking by forced labor by requiring his children to work in the family business, even by force." We disagree.

"[D]etermining whether a particular result is absurd is a dangerously subjective endeavor." *Ritz,* 533 S.W.3d at 308 (Newell, J., concurring). "[T]he bar for concluding a plain-faced interpretation of a statute would lead to absurd results is, and should be, high." *Id.* (citing *Combs v. Health Care Servs. Corp.*, 401 S.W.3d 623, 630 (Tex. 2013)). "It should be reserved for truly exceptional cases, and mere oddity does not equal absurdity." *Id.* "Even if a consequence is unintended, improvident, or inequitable, it may still fall short of being unthinkable or

–23–

unfathomable." *Id*. The focus should be on "whether it is quite impossible that a rational legislature could have intended it." *Id*.

Here, though we recognize Mr. Barrett's conduct did not constitute what the term "human trafficking" ordinarily brings to mind, the language of the trafficking statute is broad and his acts of transporting and harboring his three children in question and benefiting from their forced labor or services conform to that language. The statute's plain text "demonstrates our legislature's focus upon protecting exploited children." *Griffin v. State*, 662 S.W.3d 470, 472 (Tex. Crim. App. 2021) (Newell, J., concurring). To that end, it is at least possible the legislature rationally might have wished to significantly increase the sentences available for persons who commit the particularly egregious conduct of isolating a child, thus depriving him or her of educational opportunities, and limiting his or her activity to continual forced labor through frequent beatings and insults for years in order to benefit from the child's labor. *See United States v. Toviave*, 761 F.3d 623, 626 (6th Cir. 2014) (noting that "a parent or guardian can commit forced labor, and is not immunized by that status," and stating in dicta that the federal forced labor statute would apply to a "forced-labor sweatshop" run by a parent of a child victim); *see also Ex parte Barrett*, 608 S.W.3d at 94–95 (parents' rights regarding their children's labor "are not absolute and may be limited by the compelling governmental interest in the protection of children" (citing *Schlittler v. State*, 488 S.W.3d 306, 313 (Tex. Crim.

App. 2016)).[5] This is a policy determination our legislature gets to make. *Griffin*, 662 S.W.3d at 472. We are not at liberty to disturb it. *Id*.; *see also Ritz*, 533 S.W.3d at 303 (Newell, J., concurring) (stating that reaching conclusion sought by appellant would "require[] this Court to redraft the statute to add terms that our legislature did not include and risks substituting our own policy considerations for those of our legislature"). For these reasons, we conclude the evidence is sufficient to support Mr. Barrett's conviction under section 20A.03.

### *Denial of requested jury instruction*

The trial court must provide the jury with "a written charge distinctly setting forth the law applicable to the case." TEX. CODE CRIM. PROC. art. 36.14. The law applicable to the case includes "statutory defenses, affirmative defenses, and justifications whenever they are raised by the evidence." *Walters v. State*, 247 S.W.3d 204, 208–09 (Tex. Crim. App. 2007). Generally, neither the defendant nor the State is entitled to a jury instruction relating to a statutory offense or defense if that instruction "(1) is not grounded in the Penal Code, (2) is covered by the general charge to the jury, and (3) focuses the jury's attention on a specific type of evidence that may support an element of an offense or a defense." *Id*. at 212.

---

[5] As noted in Justice Newell's *Griffin* concurrence, "[w]hen the legislature meets without changing a statute, after that particular statute has been judicially construed, we presume the legislature intended the same construction should continue to be applied to that statute." *Griffin*, 662 S.W.3d at 472. The Texas Legislature has met since *Ex parte Barrett* was issued and "did not change the statute." *Id*.

In reviewing complaints of jury charge error, we first determine whether error exists. *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012); *Keller v. State*, 604 S.W.3d 214, 229 (Tex. App.—Dallas 2020, pet. ref'd). If error exists, we must determine whether the error caused sufficient harm to warrant reversal. *Ngo v. State*, 175 S.W.3d 738, 743–44 (Tex. Crim. App. 2005). When, as here, an appellant preserves error, the error is reversible if it caused "some harm" to his rights. *Id*. at 743. The appellant "must have suffered some actual—rather than merely theoretical—harm." *Chambers v. State*, 580 S.W.3d 149, 154 (Tex. Crim. App. 2019).

Neither the State nor the appellant bears the burden on appeal to prove harm. *Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013). We assess harm in light of the entire jury charge, the state of the evidence, including contested issues and the weight of the probative evidence, the parties' arguments, and all other relevant information in the record. *E.g., Cosio v. State*, 353 S.W.3d 766, 777 (Tex. Crim. App. 2011).

In his third issue, Mr. Barrett contends the trial court erred by denying "a requested jury instruction central to his defense" and he was harmed by the omission. He argues (1) the Texas Administrative Code "provides that labor trafficking does not include being required to work in the family business without pay"; (2) without an instruction to that effect, "the jury was not given all of the law applicable to Appellant's case"; and (3) the trial court's denial "was tantamount to denying

–26–

Appellant the right to instruct the jury on his justification defense thus depriving him of a fair trial."

As described above, Mr. Barrett's counsel requested that the charge quote "Administrative Code 704.59(B)," which he asserted "states that labor trafficking does not include normal contributions to the family and community life in light of prevailing community standards." Though the administrative code contains no section "704.59," we presume defense counsel meant section 707.459, which is titled "What is labor trafficking?" *See* TEX. ADMIN. CODE § 707.459.[6] Though subsection

---

[6] The Texas Administrative Code is a compilation of all state agency rules in Texas. *See* www.sos.state.tx.us/tac/index.shtml. Section 707.459 was promulgated by the Texas Department of Family and Protective Services and states in relevant part:

(a) Labor trafficking is a subset of the statutory definitions of abuse that appear in Texas Family Code §261.001(1) and includes the following acts or omissions by a person:

(1) Knowingly causing, permitting, encouraging, engaging in, or allowing a child to be trafficked in a manner punishable as an offense under §20A.02(a)(5) or (6), Penal Code; or

(2) The failure to make a reasonable effort to prevent a child from being trafficked in a manner punishable as an offense under §20A.02(a)(5) or (6), Penal Code.

(b) In this section, the following terms have the following meanings:

(1) "Labor trafficking" means enticing, recruiting, harboring, transporting, enslaving, or providing to others or obtaining for oneself a child for labor or services through force, fraud, coercion, or exploitation. It involves giving or receiving monetary or nonmonetary remuneration, including the child's services, and a pervasive loss of freedom for the child.

(A) When determining whether a child is a victim of labor trafficking, we evaluate the totality of circumstances, including but not limited to evidence that the child is being controlled by threats of deportation or physical or other types of harm to the child or the child's family; evidence of withholding or destroying of the child's legal documents; causing the child or child's family to become indebted to the trafficker; restricting the child's movement, communication, or ability to live a normal life; the detrimental nature of the work to the health, safety, or well-being of the child; or using physical, verbal or sexual intimidation or other types of manipulation to cause the child to feel helpless or in fear of the trafficker.

–27–

707.459(b)(1)(B) corresponds to defense counsel's requested instruction, that subsection states it applies "in this section," namely section 707.459, which pertains to defining "abuse" under the Texas Family Code and is not part of the penal code. *See id.*

The penal code's Chapter 9 addresses justification defenses to criminal responsibility. That chapter provides, "It is a defense to prosecution that the conduct in question is justified under this chapter." TEX. PENAL CODE § 9.02. As described above, the jury charge contained a justification instruction based on penal code section 9.61 that stated, "The use of force, but not deadly force, against a child younger than 18 years is justified: if the actor is the child's parent and when and to the degree the actor reasonably believes the force is necessary to discipline the child or to safeguard or promote his welfare." Thus, the charge allowed for a justification defense regarding Mr. Barrett's use of force, which the jury rejected. Nothing in the penal code demonstrates the legislature intended to encompass or adopt any portion of section 707.459 in that code.

Because the record shows Mr. Barrett's requested jury instruction (1) was "not grounded in the Penal Code," (2) was "covered by the general charge to the jury,"

---

(B) Labor trafficking does not include normal contribution to family and community life in light of prevailing community standards, such as performing chores inside and outside of the house, being required to work in the family business without pay, working in agriculture or farming as part of the family's business or means of earning a living, or other forms of labor or services specified under Texas Labor Code §51.003.

40 TEX. ADMIN. CODE § 707.459.

and (3) "focuse[d] the jury's attention on a specific type of evidence that may support an element of an offense or a defense," we conclude the trial court did not err by denying the requested instruction. *See Walters*, 247 S.W.3d at 212; *see also Sharpe v. State*, No. 03-21-00437-CR, 2022 WL 3903009, at *5–6 (Tex. App.—Austin Aug. 21, 2022, pet. ref'd) (mem. op.) (stating parent charged with assault under penal code based on striking his child was not entitled to jury instruction on family code provisions regarding his right to direct his child's upbringing because those were "non-Penal Code" provisions that could improperly focus jury, and trial court provided proper justification instruction based on penal code section 9.61).

Moreover, the record does not show actual harm to Mr. Barrett. As already addressed, the charge contained a justification defense that the jury rejected. Additionally, administrative code subsection 707.459(b)(1)(B) allows only for labor constituting "normal contribution to family or community life in light of prevailing community standards." Nothing in the record shows the forced labor in this case was "normal" or was consistent with "prevailing community standards." Thus, the record does not show Mr. Barrett "suffered some actual—rather than merely theoretical— harm." *See Chambers*, 580 S.W.3d at 154.

We affirm the trial court's judgment.

220219f.u05
Do Not Publish
Tex. R. App. P. 47.2(b)

/Cory L. Carlyle/
CORY L. CARLYLE
JUSTICE



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

JEFFERY LEON BARRETT,
Appellant

No. 05-22-00219-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 354th Judicial
District Court, Hunt County, Texas
Trial Court Cause No. 32470CR.
Opinion delivered by Justice Carlyle.
Justices Molberg and Smith
participating.

Based on the Court's opinion of this date, the judgment of the trial court is
**AFFIRMED**.

Judgment entered this 28th day of April, 2023.